**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Karthik Saravanan | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| Drexel University | : | NO. |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | **Jury Trial Demanded** |
| | : | |
| **Defendant** | : | |
| | : | |

**COMPLAINT**

Karthik Saravanan ("Plaintiff") through his undersigned counsel, files this civil complaint against defendant Drexel University, and in support avers as follows:

**I.      NATURE OF THIS ACTION**

1.  Plaintiff seeks justice against Drexel as it is responsible for the actions of a small group of administrators who discriminated against Plaintiff when they gave credence to a falsely stated and 363 days old allegation of sexual harassment from Ms. Julie Koffler, a white female Drexel student and Maryland native, and mishandled Plaintiff's complaint that it was Ms. Koffler who had sexually assaulted him after getting him drunk.

2.  Plaintiff, a man of color, and Ms. Koffler met at as freshmen at a Drexel.

3.  On August 18, 2015 they had an interaction in the Drexel dorms that during the subsequent 364 days of pervasive hostility and abuse plaintiff twice reported to Drexel as

rape and hostility and which Ms. Koffler would preempt stating that plaintiff sexually harassed her in grieving his rape victimization at her very hands.

4. From day one of these complaints, Ms. Koffler received sex and race based preferential treatment from Drexel's administration for her spurious allegation against Plaintiff, while Plaintiff was punished when he was held responsible for this falsely-stated harassment and when the administration acted with deliberate indifference towards his complaint that it was Ms. Koffler who had assaulted him the night of August 18, 2015.

5. From the moment that Drexel learned that Ms, Koeffler had sexually assaulted plaintiff, Drexel suspended the plaintiff and not Ms. Koeffler simply because Drexel believed and gave preferential treatment to a white female student over a male student of color.

6. In handling the process that led to finding Plaintiff guilty of sexual harassment and stalking while ignoring the fact he is a victim of rape and that Ms. Koeffler violated plaintiff's Protection from Abuse Order, the administration, specifically but not limited to Assistant Dean Stephen Rupprecht, Title IX Coordinator Michelle Rovinski, Drexel Police Detective Robert Lis, and Compliance Specialist Janna Perez, deprived Plaintiff of his rights under Title IX to a sexual harassment free and under Title VI to a race discrimination free academic environment and also violated his contractual rights.

7. Throughout, defendant failed to adhere to laws, to its contract with plaintiff, and to its own policies which ostensively mean to protect Plaintiff both as a victim of sexual assault and as a falsely-accused respondent of sexual assault destroying his life as a result.

## II.      THE PARTIES

2

8. Plaintiff is a resident of Pennsylvania, of South Asian national origin.  Plaintiff was enrolled as a student at Drexel University until defendant ended his enrollment.

9. Defendant Drexel University (hereinafter "Drexel"  "the Administration" or "University") is a private university with a principal address of 3141 Chestnut Street, Philadelphia, Pa 19104.

## III.    JURISDICTION AND VENUE

10. Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681, et seq. and 28 U.S.C.§1331. 23; and because of the race discrimination claim under Title VI of the 1964 CRA, 42 U.S.C. § 2000d et seq.

11. Plaintiff also invokes jurisdiction under this Court's power to prevent discrimination based on race as codified in 42 U.S.C. §1981 which specifically prohibits against the use of race discrimination in the enforcement of contracts in the United States.

12. Plaintiff invokes this Court's equitable powers under 28 USC §2201.

13. Pursuant to 28 U.S.C. §1391, venue for this action properly lies in this district because a substantial part of the events or omissions giving rise to the claims set forth below occurred in this judicial district.

14. Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C.§1367. 25.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.**    **Agreements, Representations, Covenants and Warranties Between Plaintiff and Drexel University**.

15. On or about the Spring of 2014, Drexel offered Plaintiff and Plaintiff accepted a place in its freshman class of 2015.

16. At the time of this contract Drexel and Plaintiff agreed to rules of behavior included in the Drexel University: 2016 Annual Report of Campus Security and Fire Safety Policies and Procedures which states the OED-III policy (**Exhibit A "policy"**) as well as to any modifications of the same via subsequent handbooks, reports, and other adopted policies.

17. Plaintiff chose Drexel, in part, because Drexel specifically represented it had a reputation for a due process-driven sexual complaint system and for dealing with racial oppression that guaranteed all, including men of color like him, a voice and equal treatment**.**

18. Ms. Koffler, on information and belief, is white and similarly accepted the same terms at or about the same time as she was also offered a spot in Drexel's class of 2015.

19. At the time of the investigation of the events in controversy, Drexel University: 2016 Annual Report of Campus Security and Fire Safety Policies and Procedures and specifically the OED-III expressly covenanted rights to respondents of sexual assault including a factual investigation, a report of this investigation, an opportunity to respond to this report, all leading to a discretionary decision on the part of Drexel's administration whether or not to proceed with charges.

20. Drexel University's OED-III policy also expressly covenanted rights to complainants of sexual assault unfortunately leading to a discretionary, subjective and discriminatory decision on the part of Drexel's administration whether or not to proceed with charges.

21. Finally, during 2016, Drexel acted under its OED-III definition of "consent" and ignored the fact that plaintiff could not consent during the sexual assault he endured on August 15, 2015 as well as ignored the fact that plaintiff at no point ratified this sexual assault:

> "Consent is defined under Drexel University's Sexual and Gender-Based Harassment and Misconduct Policy as a freely and affirmatively communicated willingness to participate in sexual activity or behavior, expressed either by words or clear, unambiguous action. Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Consent may not be inferred from silence, passivity, lack or resistance or lack of active response. Consent must be present throughout the sexual activity. Under the University's Policy, an individual who is incapacitated is not able to make rational, reasonable judgments and therefore is incapable of giving consent. Incapacitation is defined as the inability, temporarily or permanently, to give consent, because the individual is mentally and/or physically helpless due to drug or alcohol consumption, either voluntarily or involuntarily, or the individual is unconscious, asleep or otherwise unaware that the sexual activity is occurring. In addition, an individual is incapacitated if he/she demonstrates that he/she is unaware of where he/she is, how he/she got there, or why or how he/she became engaged in a sexual interaction. Where alcohol is involved, incapacitation is a state beyond drunkenness or intoxication."

> Drexel University OED-III Policy as found in: 2016 Annual Report of Campus Security and Fire Safety Policies and Procedures at 24 "Policy" (**Exhibit A**).

22. Plaintiff relied on each of the provisions of these policies to prove his very clear innocence against Ms. Koffler's bald statements that Plaintiff had consented to have sex with her on August 18, 2015 and had sexually harassed her until August 16, 2016. Plaintiff was unable to avail himself of these provisions' protections because he experienced Drexel's sex-based and race-motivated animus against him.

23. Plaintiff relied on each of the provisions of these policies to state his accusation that Ms. Koffler sexually assaulted him on August 18, 2015 and harassed him to the extent that Drexel became a pervasively hostile environment for him since, and was unable to avail himself of these provisions' protections because he experienced Drexel's sex-based and race-motivated animus against him.

24. Plaintiff relied on each of the provisions of these policies to state his accusation that as part of Drexel's pervasively hostile environment, he experienced terror of Ms. Koffler's threats, which he tried to assuage. This was  not ratification of Ms. Koffler's conduct.

25. Plaintiff avers that he was unable to adequately rely on the provisions above due to sex and/or race motivated discriminatory actions by a number of Drexel employees; acts memorialized in part by plaintiff's previous lawyer, Mariana Rossman, Esq., who memorialized and noticed them, at that time, December 5, 2016, writing to Drexel's Chief of Litigation Services, JuHwon Lee, Esq. that:

   a.   Drexel's employees Jenna Perez (Latina) and Robert Lis' (white) behavior was so "offensive" that Ms. Rossman "felt compelled to write to" Mr. Lee about it. (**Exhibit B**).

    b.   Lis and Perez openly made fun of plaintiff and of his claims in front of plaintiff and Ms. Rossman , including Perez telling Lis:  "Bob, you're just killing it [with your jokes] today" (**id**).

    c.   Lis stated to plaintiff:  "maybe I need to teach you my English" and when challenged stated again, "that perhaps he [Lis] needed to teach [plaintiff] "his" English (id).

    d.   As Ms. Rossman stated to Mr. Lee "these are but a few examples of the insensitive and discriminatory treatment" Drexel foisted on Plaintiff (id).

    e.   "Rather than respond to his allegations [that he is the victim of Koffler's sexual assault] with concern and encouragement, however, [Plaintiff] has been mocked and ridiculed [by Drexel]" (id).

26. Plaintiff avers that he remained unable to adequately rely on the provisions above due to sex and/or race motivated discriminatory actions by a number of Drexel employees that are so systemically ingrained that they seem to have eluded the responsibilities of JuHwon Lee, Esq., who apparently did nothing in response to Ms. Rossman's letter of December 5, 2016, prompting her to memorialize and notice Drexel of the continued discriminatory practices on January 3, 2017, again writing to Mr. Lee, Esq. that:

    a.   "No interim measures whatsoever have been taken against Ms. Koffler, who [Plaintiff] accused of sexual assault, intimate partner violence, retaliation, stalking and harassment, all of which took place between August 2015 and September 2016."  (**Exhibit C**).

b. "This disparate treatment is not only unfair,...It is further evidence that the University does not view [Plaintiff] as a victim, but solely as the accused." (id).

c. Perez prevented plaintiff and his lawyer from effectively reviewing the investigative report and from providing additional information (id).

d. Perez forced Plaintiff and his lawyer to meet with Perez at exactly the same time that Perez made a deadline for filing exculpatory and otherwise important documents expire (id).

e. Perez' report, as Ms. Rossman reviewed it, did not include "the names of several individuals" Plaintiff had provided Perez with .  "At least one of these individuals was present and has information about the assault to provide."  (id).

f. "By contrast, it appears the University has gone to great lengths to speak with witnesses who might benefit Ms. Koffler."  (id).

27. Ms. Rossman copied her January 3, 2017 notice of continued discrimination against Plaintiff on Michelle Rovinsky, Drexel's Title IX coordinator, also to no avail.  (id).

28. Plaintiff avers that Rovinski discriminated against him in terms of his sex when she denied him the academic support and other assistance that Title IX affords Plaintiff while providing all manner of support and advocacy for Koffler, just because she is a woman.

29. Drexel's systemic animosity in its handling of the investigative, adjudicative and sanctioning phases of this matter-- which prevented Plaintiff's ability to respond to and defend against both--coupled with Drexel's complete and systemic deliberate

indifference to the Plaintiff's complaint that Ms. Koffler assaulted him violated his rights both as a complainant and respondent of sexual assault and as a man of color enrolled at Drexel.

**B.**     **Plaintiff and Ms. Koffler's Only Sexual Encounter Involved Ms. Koffler getting Plaintiff Drunk and Sexually Assaulting Him in his Drexel Dorm on August 18, 2015.**

30. Plaintiff drank alcohol which Ms. Koffler provided in his Drexel dorm and became visibly intoxicated as well as incapacitated on August 18, 2015.

31. Ms. Koeffler spent one year threatening Plaintiff into silence and when the Plaintiff broke his silence, on August 15, 2016, Ms. Koeffler victimized him again, simply visiting Drexel's Counseling Center and Drexel's Office of Equality and Diversity (OED) to state that it was plaintiff who had created a hostile environment for Ms. Koeffler because he was grieving her raping him.

32. Soon after August, 2015, Ms. Koffler threatened plaintiff that if he talked about her sexually assaulting him, even with his therapist, she would retaliate by among other things falsely telling his entire social group that he is mentally ill and/or gay.

33. Ms. Koffler continued with this pervasive threatening conduct against plaintiff which culminated with her pre-emptive and falsely stated complaint that the plaintiff was harassing her because he was threatening to commit suicide.

34. Plaintiff and Ms. Koffler interacted with each other during this period of time not because plaintiff was ratifying after the fact Ms. Koffler's sexual assault but rather because Ms, Koffler was threatening and humiliating plaintiff into silence about her assault on him.

35. Drexel, acting with outrageous race and sex tinged animus, and knowing the plaintiff was emotionally fragile, as Ms. Koffler herself noticed Drexel of this, still suspended him but not Ms. Koeffler, on August 16, 2016.

36. As Drexel knew from the start of its discriminatory conduct against Plaintiff, both Plaintiff and Ms. Koffler went to Court on August 22, 2016 and obtained mutual PFA's making a detailed and sworn public record in the Philadelphia Family Court of what happened on August 18, 2015 and after, which turned Drexel into a pervasively hostile racist and sexist educational environment for Plaintiff:

    a.    According to plaintiff's sworn testimony transcript:

Mr. Saravanan:  "I tried to push her [Ms. Koffler] away.  She pushed me onto the bed.  I told her 'I don't want this,' and 'to please get off.'  And I was motioning for her to.  She said 'No. It's fine. It won't hurt.'  She reached into my underwear and put a condom on my penis. And I remember blacking in and out and I remember that she was on top of me and that we were having sex. I was unable to really push her or get her off of me."  (**Exhibit D,** 59, 21-25, 60, 1-4)

    b.    According to Ms. Koffler's pro se cross of plaintiff:

Ms. Koffler:  "Mr. Saravanan, do you recall telling me that a way to solve all this was if we slept together again?"

Mr. Saravanan:  "No I do not."   (**Exhibit D**, 86, 16-19).

That is, Ms. Koffler never denied the sexual assault charge plaintiff leveled against her nor did she deny her other physical violence against plaintiff.

37. Drexel's employee Amy Spiller accompanied and supported Ms. Koffler only during this hearing.  Thus, Spiller's presence means Drexel knew from the start that Koffler raped plaintiff because Spiller had notice. Similarly, Ms. Spiller, and Drexel, also learned at that time of other men Ms. Koffler may have assaulted and Drexel suppressed this evidence which at the very least establishes patterns of assaults and their suppression.

38. Drexel knew Plaintiff was a victim of rape before it started investigating this matter because Plaintiff's sworn testimony in front of Spiller (and thus Drexel) as shown in **Exhibit D** perfectly states that Ms. Koffler violated Drexel's policy (**Exhibit A**). Plaintiff's sworn testimony spoke and speaks for itself: he could not consent and did not ratify the sexual assault of August 18, 2015.  An unrepresented Ms. Koffler then went on to admit in the same hearing testimony that she sexually touched him by assuming that act in her question and then asking plaintiff "...if we slept together again." Because Spiller was there Drexel learned of Ms. Koffler's admission at that time.

39. Throughout this process Drexel acted with race and sex based animus when it ignored or failed to give proper weight to an electronic communication via Snapchat with Plaintiff where Ms. Koffler admits her sexual assault of plaintiff:

> Plaintiff:  "Haha speaking about meeting people, I wasn't happy about meeting Shyla that day."  [Plaintiff avers that Ms. Koffler called her genitalia "Shyla"].
>
> Ms. Koffler:  "Sorry for misbehaving like that.  I just get like that.  Like really lonely and depressed.
>
> Plaintiff:  "***I said no tho***" [sic]. [emphasis added]

Ms. Koffler:  "***You did but I didn't know it was your first time***.  I totally ruined

that for you .  You're not the only one.  Sorry bud.  Shyla is sorry too."  [emphasis

added].  (**Exhibit F**).

40.   Thus, the preponderance of the evidence shows that under Drexel's policy as tainted by

the many administrators this complaint identifies (and others) Ms. Koffler raped Plaintiff

on August 18, 2015 and even though a former Pennsylvania Supreme Court Justice found

her guilty of sexual harassment, Drexel did not punish Ms. Koffler for it, while

disparately punishing plaintiff for a minor finding--that plaintiff had stalked Ms. Koffler,

a finding only possible because of the suppression of significant exculpatory evidence

from the investigation.  In all cases the preponderance shows a disparate result indicating

blatant discrimination from Drexel's systemic racism and sexism against men of color

like plaintiff compounded with Drexel's administrators' biased and clearly substantial

departures from their duties to honor the contract between Drexel and plaintiff.

41. The racist and sexist animus that tainted Drexel's entire handling of this process meant

that Drexel characterized the period between August 18, 2015 through August 15, 2016,

not as one during which Plaintiff was under Ms. Koffler's control because she was

threatening him, but rather as one where he was stalking her by doing exactly what she

ordered him to do via texts that the Plaintiff provided to Drexel.  Ms. Koffler's

victimization of Plaintiff's violated Drexel's policy.

42. In addition, for this period, the pervasive nature of Ms. Koffler's hostility towards

Plaintiff included her physically abusing him, slapping him hard on the face on at least

three times on campus, May 5, July 28, and December 23, 2016--basically every time the

Plaintiff told Ms. Koffler he would disclose the rape to his therapist Ms. Koffler punished plaintiff with actual physical harm.  Koffler's slaps violated Drexel's policy.

43. It is Drexel's failure to protect Plaintiff as a victim of rape on the Drexel Campus that prevented him from actually getting therapy and from dealing with his pain.

44.  As Plaintiff's situation at Drexel's hostile campus did not improve, even Ms. Koffler admitted under oath that the hostility she created for plaintiff led him to tell her that he would harm himself and/or report her to Drexel for raping him.

45. That is the notice that Ms. Koffler took to Drexel:  That Plaintiff was about to harm himself and that she was concerned about that.  Drexel then suspended him and not her.

46. The Plaintiff required and obtained a PFA because of the severely pervasive sexually hostile environment that Ms. Koffler created for him at Drexel's campus and from which Drexel refused to protect him with deliberate indifference.  But Drexel did not support him in this process; quite the opposite, Drexel supported the white woman.

47. Drexel exhibited race and gender biases against the Plaintiff first when Amy Spiller personally intervened to have an intake clerk at the Court deny Plaintiff's application for a PFA and second, when plaintiff's counsel obtained this PFA, characterizing the Philadelphia Family Court issued PFA of August 22, 2016 as retaliation against Koffler.

48. Even Ms. Koffler admitted under oath that plaintiff told her she was bullying him to death on or about June 20, 2016.

49. As a result of Ms. Koffler's pervasive sexual hostility, as many other sexual assault survivors do, plaintiff was embarrassed and afraid of Ms. Koffler, seeking to please her, which included acquiescing to several exploitative demands from Ms. Koffler between

August 18, 2015 through August 16, 2016, like

a.      That he serve as her chauffeur to and from her work.  (**Exhibit H**)

b.      That he buy her clothes.

50. As a result of Ms. Koffler's pervasive victimization of Plaintiff, he even confessed to Ms. Koffler on or about June 22, 2016 in the common area of her suite at Drexel that he was going to tell her parents and his therapist she had raped him.

51. Plaintiff confessed to Ms. Koffler that he no longer could deal with that emotional burden by himself particularly because Drexel had done nothing to protect him from Ms. Koffler's bullying in violation of his contract, Title VI, and Title IX rights.

52. What Drexel did do was suspend Plaintiff on or about August 16, 2016; a pro-female discriminatory move based entirely on Koffler's claim that plaintiff was about to harm himself.  A callously indifferent Drexel then compelled Ms. Koffler to file criminal charges against Plaintiff who as far as Drexel knew was a risk to his own safety.

53. Thus, by contacting Drexel's Title IX Office, a white woman stating that a male Drexel student of color was suicidal, managed to have that man expelled and all claims that she raped that man (the reason for the falsely-stated suicide) callously ignored.

54. Ms. Koffler's status as a white woman triggered Drexel's staff's animosity against Plaintiff which suggests that these staff  lack Title IX training and fluency, that these staff acted with racism, and that they substantially violated plaintiff's contract with Drexel.

55. The animosity of these staff against plaintiff is evident because they ignored what they already knew through Amy Spiller and others, or else what the plaintiff provided them with, proof that it was Ms. Koffler who raped and then controlled him including:

a.      Texting with him to appear at social functions (**Exhibit H**).

b.      Ms. Koffler's in-Court sworn admission that they had "slept together" (**Exhibit D,** 86, 16-19)

c.      The Snapchat where Ms. Koffler admits to the rape (**Exhibit F**).

56. Plaintiff provided Drexel with proof that it was Ms. Koffler who sought his companionship to prevent him from talking about her raping him and that it was Ms. Koffler who created a pervasively hostile environment at Drexel for him, but Drexel not only ignored all of this evidence, it actually took unrelated evidence from Ms. Koffler at face value because it undermined and discriminated against Plaintiff.

57. All of this evidence, which Drexel ignored, absolutely belies all the allegations that Ms. Koffler falsely stated against plaintiff and, when seen absent male and race biases, it clearly supports the claims that Ms. Koffler turned Drexel into a hostile environment for plaintiff and proves that Drexel staff discriminated against the plaintiff as well as violated his contract with Drexel.

58. In addition, Ms. Koffler flaunted Judge Holly Ford's Protection from Abuse order of August 22, 2106, continuing to appear in Plaintiff's vicinity; a fact well known to and ignored by defendant because Ms. Koffler is a white woman they treated preferentially.

**C.**     **The 363 Days Following Ms. Koffler's August 18, 2015 Sexual Assault of Plaintiff.**

59. On information and belief, based on Plaintiff's recollection of the investigative file, Ms. Koffler made no effort to report to tell anymore of any incident of harassment or stalking on the night she assaulted the plaintiff, or even the next days, weeks, or months.

60.  A grief and shame stricken Plaintiff, however, reported this assault twice and twice Drexel discriminated against him for so reporting.  Thus Drexel's act evidences a bias for women and against men when it comes to reporting sexual assault.

61. Even worse, Drexel prevented this information, that Plaintiff had attempted to file a report that he had been sexually well before the PFA, from reaching the adjudicator of this matter who then thought it was self-serving of Plaintiff to have accused Ms. Koffler of raping him as a counter-claim to her claim that he stalked her.

62. Plaintiff reported nothing again because following  his attempt to do so, not only did Drexel discriminate against him, but  Ms. Koffler had him under threat and surveillance. If Plaintiff said anything about her raping him she would destroy his social standing.

63. Drexel's own timeline reflects the fact that Ms. Koffler only approached Drexel with her falsely stated and ill-defined complaint that plaintiff's falsely-stated suicidal threat was disturbing her on August 15, 2016, that is a few hours, maybe a day, after plaintiff told Ms. Koffler he would tell his therapist and her parents that she had raped him.

64. Until the adjudication, Plaintiff never mentioned to any healthcare provider that Ms. Koffler sexually assaulted him because she had threatened him with the social ridicule at Drexel and legal retaliation if he so much as discussed the rape with his therapists.

65. Drexel's own timeline reflects that all Ms. Koffler originally told Drexel was that she "could no longer carry the weight of someone else's safety on her shoulders and was concerned for her safety and the safety of [Plaintiff] due to his persistent conduct and his repeated discussions of suicide."

66. Even if true, this is not an allegation of sexual harassment but rather notice to Drexel that one of its students was suicidal. Koffler's statement to Drexel pales in comparison with the Plaintiff's sworn statement that Ms. Koeffler raped him on August 18, 2015--an act that Drexel knew Ms. Koeffler had admitted to (**Exhibit F, Exhibit D**, 86, 16-19).

67. Between August 18, 2015 and August 16, 2016, Plaintiff and Ms. Koffler interacted socially at her request, and at no time did Plaintiff threaten to commit suicide or otherwise pose a threat to anyone; rather he spent this time assuaging Koffler's threats of ridicule while nursing his own grief and thoughts of self-harm.

68. There is simply no direct evidence that Ms. Koffler was assaulted, harassed, stalked, or suffered any trauma from Plaintiff's presence on campus on or for the 363 days following Ms. Koffler's assault of the plaintiff on August 18, 2015 and there is direct evidence that it was Koffler who forced the plaintiff to keep communicating with her so she could prevent him from talking about, getting therapy for, or complaining of the rape.

69. In a sad feat of sex and race based discrimination against the plaintiff, however, Drexel staff took the clear facts of these 363 days of the plaintiff's suffering and transformed them into 363 days of stress for Ms. Koffler leading to an investigation and prosecution so biased that it yielded an erroneous outcome on plaintiff's conduct, using an arcane assumption on male conduct, and a pervasive bias towards plaintiff's sex and race.

70. A non-exhaustive list of Drexel's discriminatory actions against plaintiff includes: (a) Failure to conduct an adequate and impartial investigation. (b) Improper advice and advocacy on Koffler's behalf only. (c) Assumption of guilt from the male. (d) Assumption that a female cannot rape a male. (e) Credibility and evidentiary weight

assessments always favored Koffler. (f) Denial of Plaintiff's right to examine and correct the file. (g) Failure to afford plaintiff the required presumption of innocence required by the preponderance of the evidence standard. (f) Unwarranted, unduly severe, and outrageously disparate sanction.

**D.      Drexel's Media Concerns Trigger a Reform of its Title IX Policy Which Enables Ms. Koffler's Pre-Emptive Complaint Against and Continued Victimization of the Plaintiff .**

71. On April 23, 2015 Drexel President John A. Fry announced to Plaintiff and others that Drexel had joined the national effort on preventing sexual assault including implementing national expert recommendations on the handling of sexual assault reports; a guarantee that in contract and under Title IX as well as its guidance applied to plaintiff but which in practice applied only to Koeffler, the white female. (**Exhibit I**).

72. The genesis of this national effort is the many well publicised scandals surrounding sexual assault on campus and the responsive policies from the Federal Government.

73. For example, Drexel was under pressure from Assistant Education Secretary Llamon who on February, 2014, told a national gathering of college officials that colleges needed to make a "radical" change on sexual assault.  The Chronicle of Higher Education reported the audience's reaction as "crisp marching orders from Washington."  *Colleges are Reminded of Federal Eye in Handling of Sexual-Assault Cases*, The Chronicle of Higher Education, February 11, 2014.

74.  The pressure only increased for Drexel through the national media's attention to this topic.  On July 2014 Assistant Education Secretary Llamon told a sexual-assault themed gathering of higher education administrators at Dartmouth College that she was prepared

to cut off federal funding to schools that violated Title IX or did not comply with the Dear Colleague letter's in-campus sexual assault mechanism.  Meredith Clark, "*Official to Colleges:  Fix Sexual Assault or Lose Funding*."  July 15, 2014.  Available at: http://www.msnbc./msnbc/campus-sexual-assaultconference-darthmouth-college#5183

75. These media and brand scandals also the school's prestige and the school's employees whose careers are damaged as a result of seeming callous to females' plight.

76. Assistant Secretary Llamon maintained the unrelenting pressure of the the executive branch to make America's college campuses safe.  "We don't treat rape and sexual assault as seriously as we should…[there is] a need to push the country forward."  David G. Savage and Timothy M. Phelps, "*How a Little Known Education Office has Forced far Reaching Changes to Campus Sexual Assault Investigations*."  Availalbe at: http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html

77. In direct response to this pressure, as Drexel's President put it back when it was popular to say so:  "Our goal is to become a leader on issues of sexual violence and misconduct among universities nationwide."  (**Exhibit I**).

78. However, Drexel's staff, in ignoring Plaintiff's claim that Ms. Koeffler raped him on August 18, 2015, in suspending him on August 16, 2016, and in effectively failing to sanction Ms. Koeffler whatsoever--all the while destroying plaintiff's life--completely failed to meet Drexel's President's then-popular goal of providing national leadership on Title IX, and simply discriminated against Plaintiff based on his sex and race for the sake of paying their lip service to a most legitimate concern with a sacrifice:  Plaintiff's career.

79. On April 17, 2017, Judge Carolyn Engel Temin, Appeal Adjudicator, issuing Drexel's own review of both sanctions--disparately imposed by a biased Rupprecht--admitted to the discrimination that destroyed plaintiff's career and grounds this lawsuit, stating:

> "Saravanan was given a sanction of Expulsion from the University effective March 20, 2017. Koffler was given a sanction of Disciplinary Probation made retroactively effective to run from August 25, 2015 to August 25, 2016. Since the sanction was imposed on March 20, 2017, it was, in effect, no sanction at all."

80. Thus, Drexel's media-driven, Education Department threatened, and popularity-fed goal to become a leader in the Title IX field transmogrified into a sexually and racially hostile environment for Plaintiff once Ms. Koffler baldly complained and led to Drexel's staff's destruction of Plaintiff's life when, ironically, Title IX was there to help this plaintiff.

**E.**     **Drexel's Administration Acting with Sex-Based and Race-Motivated Animus Mishandled the Investigation of Ms. Koffler Complaint Against Plaintiff and Acted with Callous Indifference for the Investigation of Plaintiff's Complaint Against Ms. Koffler.**

81. On or about August 16, 2016, 363 days after Ms. Koffler assaulted him, and at most a couple of days after he told Ms. Koffler he would disclose the assault, Plaintiff was stunned to receive an interim suspension notice from Drexel.

82. Callously indifferent to its notice, (received as early as August 16, 2016,) that Koffler had raped the Plaintiff on August 18, 2015 and threatened him for the next year while keeping him under her surveillance, Drexel, instead of immediately offering Plaintiff the assistance that Title IX affords for rape victims like himself, actually removed his ability

to study at the Drexel campus and issued an interim suspension notice which segregated plaintiff, and not Koffler, from the student body, based on his race, and violating Title VI.

83.  Drexel,  adopting a gender archaic and racist attitude that a man of color like Plaintiff is a sexual predator, then created and posted throughout the Drexel campus a libelous flyer with plaintiff's photograph which, violating FERPA, identified his face, name, date of birth, and student ID No and called him harasser and stalker of women.  (**Exhibit J**)

84. As a result, Drexel segregated Plaintiff from the rest of the student population; something that (on information and belief) it did not do in the cases of other white students accused of assault, and which Drexel certainly did not do with Koffler who was facing plaintiff's accusation at this time because she is both white, and female, categories Drexel favors.

85. In a perfect show of Drexel's gender and racial biases against Plaintiff, Drexel's Amy Spiller called Plaintiff's accusation that Koffler raped him "ludicrous" in front of plaintiff and his counsel.

86. Drexel's Clery Statistics in its 2016 Annual Report of Campus Security (**Exhibit K**) show no "Sexual Harassment" category and show one event of "Stalking" for 2015.

87. At a minimum, this report should show two events of "Stalking" for 2015 to reflect Koffler's charge against Plaintiff and Plaintiff's charge against Koffler.

88. This inaccuracy suggests Drexel does not prosecute and does not report the sexual offenses (or their reports) on its Center City campus; all the while preferring whites over other races in the documenting and reporting of these offenses.

89.  Plaintiff avers on information and belief that the data underlying those statistics plus data on reports that were not investigated or that were withdrawn--currently available only to

Drexel--will show that Drexel does not prosecute male rape, that it only prosecutes rape where the alleged victim is female, and that it favors whites over minorities in all cases.

90. Plaintiff avers that Drexel treated him differently from other white students responding to sexual stalking like Koffler, and detrimentally because of his race and national origin.

91. Plaintiff avers that defendant treated him differently than they treated his assailant, Ms. Koffler, who is a white female, even after Drexel had perfect knowledge and notice of her assaulting the plaintiff and her violating plaintiff's PFA Order of August 22, 2016.,

92. Assistant Dean Stephen Rupprecht, Title IX Coordinator Michelle Rovinski, Drexel Police Detective Robert Lis, and Compliance Specialist Jenna Perez's treatment of Plaintiff because of his race and sex profoundly affected and negatively influenced their decision-making process as they biasedly documented Ms. Koffler's complaint and violated investigatory protocols while discriminating against the Plaintiff.

93. As a result of these staff discriminatory and contract violating practices against Plaintiff they investigative and adjudicative process masked, suppressed, or else ignored the fact that the Plaintiff at no point ratified Ms. Koffler's acts against him including her assault.

94. During the Plaintiff's interview on or about December 1, 2016 Lis and Perez made a number of statements that clearly suggest their animosity against plaintiff and that they were attempting  to entrap the Plaintiff, leading him towards self-incrimination, towards ratification of Ms. Koffler's assault, and implicitly doing this because of their biased arcane assumption that in sexual terms a man cannot be assaulted by a woman.

95. During this interview process Lis and Perez demonstrated overt racist biases against Plaintiff's race; instances that Plaintiff's counsel and mother confirm (**Exhibit B, C**).

96. Perez's documentation of the plaintiff's acts is fraught with animosity and includes:

a.      Katie Colgan suggests to Ms. Koffler to file a criminal complaint against plaintiff

as he (the *actual* victim) is "harassing and stalking" her (the *actual* perpetrator).

[Assuming Plaintiff was the perpetrator from the start on facts that are against Koffler].

b.      Ms. Colgan suggests to Ms. Koffler she file a criminal complaint against plaintiff

in the context of Ms. Koffler falsely complaining to Drexel that the plaintiff is suicidal.

[Drexel favors the white woman even at the expense of the life of the man of color].

c.      Holding plaintiff responsible for a violation of his Interim Suspension Letter

when all plaintiff did was what he had to do:  Visit Drexel's police office to complain.

[Holding plaintiff guilty of violating the Drexel-imposed barrier to his Title IX rights].

97. It is extremely troubling that plaintiff and the adjudicators never saw an original

document of the investigation of these claims; all they saw was a hearsay report, never a

handwritten or even a signed statement from any witness.  As a result plaintiff is and was

unable to confirm if the information stated in the report through these witness interviews

was true, or if it was the result of the race and sex biases that Perez, Liz, Rupprecht,

Rovinsky and others always showed against the Plaintiff throughout this process

98. Several times Plaintiff experienced blatant levels of direct sex and/or race discrimination

from Lis, particularly during an interview which plaintiff's former counsel describes as

Lis threatening plaintiff and twice stating plaintiff needed to learn Lis' "English" in

response to Plaintiff's complaint that Koffler raped him. (**Exhibit B**) [A dispositive

statement from a Drexel employee that tainted this process and which shows that in Lis'

23

arcane mind a heterosexual male must enjoy sexual assaults from a woman and that a heterosexual man of color is, by nature, a sexual predator].

99. In addition to Lis' biased comments, Perez did not accurately or factually portray Plaintiff's statements that it was actually Ms. Koffler who had assaulted him. Instead Perez, for potentially sexist or racist reasons, refused to document this in her report altogether or otherwise gave preference to documenting information that only benefited Koffler's bald claim that she was at some kind of risk because Plaintiff was grieving having been raped [by Koffler].

100.    Through her acts in handling the investigation Perez manufactured evidence that Plaintiff ratified Koffler's sexual assault in spite of knowing full well that plaintiff had stated under oath as early as August 22, 2016 that he said "no" to Koffler's sexual assault and that he kept on "blacking out" which prevents both consent or ratification (**Exhibit D**, 59, 21-15, 60, 1-4).

101.    Perez also inadequately investigated the events by:

   a.   Failing to document the fact that Plaintiff told her that Ms. Koffler, on August 18, 2015, got him drunk so he could not consent, and then assaulted Plaintiff.

   b.   Failing to investigate and incorporate into the report the questions of Ms. Koffler's character and reputation for truthfulness which Plaintiff told her.

   c.   Failing to investigate and include in the report Ms, Koffler's continued flaunting of Judge Ford's PFA of August 22, 2016.

     d.   On information and belief, failing to get supervision from Drexel's Title IX office. There is no proof that the report or the investigation complied with Drexel's own Title IX procedure or with the Act itself.

102.    During her interviews with Plaintiff Perez specifically failed to inform and in fact prevented the Plaintiff from learning that as a rape victim he was entitled to academic support as allowed under Title IX**.**

103.    The Drexel administration degraded the integrity of the entire fact finding process and of the OED-III policy giving credence to Perez's racial and sexual biases towards Plaintiff as well as pandering to the social and political pressure to prosecute men.

104.    In response to Plaintiff's complaint that Ms. Koffler was retaliating against him by threatening him with disclosing to their immediate social group as well as to the Drexel student body that plaintiff was either mentally ill, gay, or both, Perez charged and investigated Plaintiff for retaliating when he complained that Koffler violated the PFA and gave credence to bald accusations from Ms. Koffler that she did not include or state during her sworn testimony on why she required a PFA from plaintiff**.**

105.    Perez's final report showed a clear favoritism, seemingly based upon sex and motivated by race, for Ms. Koffler, while showing a clear disregard for Plaintiff, as she mis-reported several facts that Plaintiff attempted to correct to no avail.

106.    Further violating Drexel's policy, consistent with her gender and/or race biased treatment of Plaintiff, Perez failed to inform Plaintiff of what Perez knew, including that because Plaintiff stated that Ms. Koffler sexually assaulted him on August 18, 2015, if Plaintiff wanted to, he could complain against Ms. Koffler including going to the police.

107.    Perez's biased and non-factual handling of the report, investigation and treatment of the Plaintiff breached the promises Drexel made to Plaintiff in its Annual Reports as well as in its sexual assault policy in terms of the investigation's fairness and due process.

108.    Perez suppressed from the process what Drexel knew from the day that Ms. Colgan heard plaintiff swear in open Court: that Ms. Koffler raped him on August 18, 2015.

109.    Perez suppressed evidence showing that there were no grounds for Ms. Koffler's complaint of stalking, and that it should have been dismissed.

110.    Perez refused and/or negligently investigated and documented Plaintiff's complaints against Ms. Koffler which the systemic discrimination against Plaintiff at Drexel undermined leading to the ultimate disparate result that plaintiff, a male of color accused of stalking, left Drexel, while Ms. Koffler, a white female who admitted to sexually assaulting Plaintiff (**Exhibit F**) suffered no sanction at all.

111.    Perez's conduct prevented Plaintiff from his right to have a fair, adequate, objective, unbiased and Title IX compliant investigative report in violation of Drexel's policy as stated in **Exhibit A**.

112.    This violation of Plaintiff's rights triggered a disciplinary adjudication against both Koffler and Plaintiff but which had presumed Plaintiff's guilt and considered his complaints against Koffler "ludicrous" (see No. 85 supra) from the start which led to failing to charge Ms. Koffler with non-consensual sexual conduct; which she committed.

113.    Drexel's Assistant Dean Stephen Rupprecht (white, male) would rely on Perez's report, as would  the adjudicator.  Both had the ability to shape, grant, or deny Ms.

Koffler's charge as well as to shape, grant, or deny the negligently documented charges the plaintiff brought against Koffler.

114.    Plaintiff avers that Rupprecht had an inherent and unwaivable conflict of interest, which he knew, which he failed to avoid, and which stemmed from his many roles in this process including decision maker of the final, disparate sanctions that Drexel issued.

115.    Both Rupprecht and the adjudicator relied on Perez's biased report to grant Koffler's remedy and destroy the plaintiff.

116.    On information and belief at least the adjudicator did not conduct an independent investigation but rather relied on facts and documents Rupprecht and Perez controlled.

117.    Rupprecht and Title IX Coordinator Michelle Rovinski, who did not supervise Perez' report and who also ignored or else undermined and discounted all of plaintiff's and plaintiff's counsel's complaints (**Exhibit B, C**) biasedly treated Plaintiff because of his race and sex which profoundly affected and negatively influenced their decision-making process leading to their violating Title IX,  and Drexel's policy, all the while discriminating against the Plaintiff by violating their duties to plaintiff under the OED-III policy on a fair investigatory process and later by punishing him.

118.    During the investigative phase of this complaint, Drexel not only placed the presumption of guilt on Plaintiff as respondent of a sexual assault complaint, but also then prevented his ability to prove his innocence by biasing the report against Plaintiff not just in terms of the evidence excluded or included, but also in terms of the adjectives used in the document itself which purposely characterized Plaintiff as guilty.

119.    During the investigative and adjudicative phase of this process, Drexel improperly placed on Plaintiff the burden to prove he had not stalked Koffler.

120.    During the investigative, adjudicative and sanctioning phase of this process, Drexel improperly accepted Koffler's allegations against Plaintiff at face value while improperly ignoring plaintiff's allegations against Koffler even though Koffler violated the PFA.

121.    Rupprecht, a white male, took over the matter from Perez' and Lis' already outrageously biased procedure and handled the rest of this matter further compounding Drexel's discrimination against plaintiff with his own outrageous gender and race biases against Plaintiff's gender and race which led to, for example:

   a.    Rupprecht imposing no sanction at all on Koffler when she was found guilty of sexual harassment by the independent adjudicator.

   b.    Rupprecht enhancing Plaintiff's punishment to either vent his own animosity against men of color like Plaintiff, or to satisfy the Drexel presidential mandate to become a Title IX leader transmogrifying that goal into this lynching.

   c.    Rupprecht considering facts not of record before the adjudicator like Koffler's travel schedule and an allegation that only her family (and not plaintiff's family) had been disrupted in this process to enhance plaintiff's punishment.

   d.    Rupprecht denying the plaintiff the opportunity to defend against those facts.

   e.    Rupprecht purposely failing to consider the aggravating factors that plaintiff and his family stated against Ms. Koffler, namely, a worse level of disruption of their family life and name than that Ms. Koffler ever identified.

f. Rupprecht stating that he had consulted with one of Pennsylvania's Supreme Court's former justices to punish plaintiff; as well as with Drexel's Title IX Coordinator, and that these two women had put their imprimatur on his decision, which is disparate on its face, to expel Plaintiff and not punish Koffler.

122. Rupprecht threatened and pressured Plaintiff and, on information and belief, also those who supported the Plaintiff to be silent, thus selectively and biasedly enforcing policies and procedures against Plaintiff and in Koffler's favor.

123. Ruprecht, however, did not enforce these same policies and procedures against Ms. Koffler because Rupprecht treated this white woman, accused of raping a man of color, better than he treated the man of color, baldly accused of stalking the white woman.

124. As a result of Ruprecht's race and gender based disparate treatment, Ms. Koffler, continued her education at Drexel, while the plaintiff was never allowed to finish his studies and was treated like and identified as a criminal on this campus (**Exhibit J**).

125. In addition, Ruprecht and Rovinsky did not give Plaintiff opportunities to review and to correct the investigative file and the additional factors they considered for punishing Plaintiff (**Exhibit B, C**) and they ignored Plaintiff's claim that Ms. Koffler assaulted him.

**F.     The Disciplinary Adjudication of February 16, 2017.**

126. Drexel's 2016 Sexual Assault Policy, "Policy" applied during the hearing and required Koffler, as a respondent of a sexual assault claim, to act as a reasonable sober person would have in that situation to obtain consent from Plaintiff.

127. Koffler stood accused of getting the plaintiff drunk in the first place such that the plaintiff could not formulate consent at all.

128.    As Plaintiff had already stated under oath well before the adjudication of this matter

Ms. Koffler touched him, sexually, without his consent, while he kept blacking out.

**Exhibit D**, 59, 21-25, 60, 1-4.

129.    Thus, Drexel's definition of "consent" should have been dispositive: The facts on

August 18, 2015,  as far as Koffler could reasonably evaluate them, show that Plaintiff

did not consent to Ms. Koffler's sexual act in violation of Title IX and Drexel policy.

130.    In addition Ms. Koffler's act as plaintiff swore to it violated Pennsylvania law.

131.    Koffler, as Drexel knew and callously ignored, actually admitted to this.  (**Exhibit F**,

with Koffler stating "You did [say 'no'] but I didn't know it was your first time" and

**Exhibit D**, 86, 16-19 with Koffler stating they had slept together before).

132.    Moreover, the facts as Drexel knew them, show that Plaintiff did not ratify any one of

the sexual abuses, including assault, that he accuses Ms. Koffler of inflicting on him.

133.    The facts, as Drexel knew them, or should have known them, show that Plaintiff

reported to Drexel that Koffler assaulted him as early as the Fall of 2015, which Drexel

callously ignored, and then again on August 15-17, 2016. Drexel had no basis, other than

animus, to take these reports as plaintiff's worthless retaliatory lie.

134.    Throughout, Ruprecht obfuscated the clear facts showing Koffler's violation of

Drexel's consent definition and tainted the adjudication with his sex-based and

race-motivated bias, similarly manufacturing evidence of Plaintiff's life under Koffler's

pervasive threat as ratification, while suppressing evidence that Plaintiff had reported the

fact that Koffler raped him first as early as the Fall, 2015.

135.   Ruprecht did this by failing to correct the file which was already biased against the Plaintiff and then through his actions during the adjudicative phase, including failing to disclose at that time that he would use evidence or allegations not of record during the hearing to determine the plaintiff's punishment, after the hearing, and to his detriment while simultaneously acting with sex and race based biases to Koffler's benefit.

136.   Ruprecht had an affirmative duty to help Plaintiff understand the file, correct it,  and to include exonerating evidence in it even at the hearing.  Ruprecht chose not to do this.

137.   Ruprecht discriminated against Plaintiff and denied him the benefit of his bargain with Drexel during the hearing exhibiting sex-based and race-motivated patterns of decision making that significantly affected the outcome of the hearing, causing it to be erroneous, including specifically:

>   (a)  letting the adjudicator believe that Plaintiff had only complained of rape after Koffler accused him of stalking,
>
>   (b) letting the adjudicator believe that the time Plaintiff spent terrified of Koffler somehow ratified the sexual assault of plaintiff that even Koffler admitted to,
>
>   (c) failing to tell the adjudicator that Rupprecht would add other evidence against plaintiff only and ignore equivalent evidence with higher weight against Ms. Koffler after the hearing, and;
>
>   (d)  disingenuously representing to all parties, including the adjudicator, that the investigative phase of this process complied with Title IX as well as had the Title IX office's approval.

138.    Had Ruprecht followed Drexel's policy, Plaintiff would have been able to show, through his testimony, and that of his witnesses that he is innocent, that he did not stalk but rather was under Koffler's control, that as even Ms. Koffler admitted she assaulted him on August 18, 2015, that Plaintiff complained of that assault well before Koffler complained against Plaintiff, and that the Plaintiff never ratified that assault.

139.    All accusations against Plaintiff are facially absurd.  Drexel knew that Koffler admitted to pressuring Plaintiff into sex (**Exhibit F**).  The rest is irrelevant and shows Drexel's systemic biases against the plaintiff which trumped Koffler's admission of her violation of Drexel policy for which she received no punishment at all (No. 79 supra).

140.    Drexel knew that Koffler assaulted Plaintiff and knew or should have known--given its flaunted obligation to staff Title IX proceedings with people trained in the handling of sexual assault--that the self-harming and emotional fragility allegations that Koffler herself communicated to Drexel about the plaintiff were the plaintiff's grief over his rape and not ratification by the Plaintiff of Ms. Koffler's sexual assault.

141.    This dispositive evidence meant nothing because it favors Plaintiff, a man of color.

142.    This dispositive evidence meant nothing because throughout Drexel behaved with an inherent bias towards males like Plaintiff that they are the rapist, never mind the outrageous fact that Koffler herself admitted to the sexual assault (**Exhibit F**).

143.    Knowingly failing to avoid the blatant conflicts of interests presented in his multiple roles, Rupprecht managed the actual flow, presentation of evidence and prosecution of both Plaintiff and Ms, Koffler during the hearing to further discriminate against Plaintiff, for example, by refusing to grant Plaintiff's witnesses help so they could miss class.

144.   Rupprecht then decided the disparate punishment that befell Plaintiff with race and

sex based animus as well as in complete violation of Plaintiff's procedural rights and of

Plaintiff's contract with Drexel.

145.    Rupprecht did so unilaterally considering, giving face value, and admitting into his

evaluation of punishment, after the adjudication, two biased and tenuous new hearsay and

irrelevant allegations concerning Koffler; that she went on vacation and that her family

was disturbed at Plaintiff's threat of self-harm.

146.   There is no record of these allegations from their alleged sources that the Plaintiff has

ever seen. Rupprecht could simply have manufactured them on his own.

147.   Rupprecht added that "new evidence" to the case with bias to increase the Plaintiff's

punishment while at the same time "not punishing" Koffler at all (See No. 79, supra) and

refusing to consider the equivalent evidence that should have increased Koffler's

punishment and instead produced the outrageous result that she was not punished at all.

148.   That act violates Drexel policy, the DOE's Dear Colleague letter, and Plaintiff's

rights concerning procedure and his contract with Drexel. It also targeted him because of

race.

149.   Thus Rupprecht undid what very little good the outside adjudicator was actually able

to do:  Rupprecht voided the process, decided in Koffler's favor, and expelled plaintiff

because of his biases against men of color who, in Ruprecht's arcane mind, can only

commit rape, and can never be raped; even when as here Koffler admitted to the rape.

150.   Rupprecht is not a lawyer, yet he acted as one, and later he acted as judge, when he

determined the sanction for each party in light of what each party was found guilty of.

151.   In addition, Drexel put the adjudicator, former Judge Jane Greenspan, who is now with JAMS, in an impossible role as the evidentiary standard she is forced to impose--a preponderance--is simply inapt for these proceedings; a legal flaw made all the much worse by the animus of the people handing the file and the process Judge Greenspan looked at--Rupprecht, Lis, and Perez--who are at best unethical and untrained.

152.   By the time Plaintiff met with the adjudicator he had already been extensively discriminated against as Drexel put on him, improperly under a preponderance evidentiary standard, the burden to prove he had not done what Koffler said he did--stalk her--when in fact what he did do was cater to her every whim trying to contain her fury.

153.   Similarly, by that time, Drexel had already segregated and racially discriminated against Plaintiff; including the posting his face as a criminal in a flyer (**Exhibit J**).

154.   Not only did Rupprecht in effect give face value to this new evidence on Koffler's trip outside the US, but he also ignored the equivalent complaints from plaintiff.

155.   As Plaintiff's mother will state; her family was extraordinarily disturbed when Drexel suspended Plaintiff and publicly identified him as a criminal (**Exhibit J**).

156.   As Plaintiff's mother will states, backed up by Plaintiff's then attorney, she was extraordinarily humiliated, while at Drexel, when Lis threatened Plaintiff, in front of her, to learn "his English." (**Exhibit B**).

157.   Plaintiff  avers that Rupprecht, Rovinski, Perez and Lis' patterns of decision making as the managers of Drexel's sexual assault system exhibited their reverse discrimination towards males like Plaintiff, their racism towards men of color like Plaintiff, and their

deliberate indifference towards the Title IX rights of male respondents and male
complainants of sexual assault like Plaintiff

158.    Ruprecht and others handled the process with clear sex-based and race-motivated bias
against Plaintiff in a manner that substantially violated Drexel's contract with Plaintiff.

159.    Ruprecht's and others' alleged biases led or were a motivating factor for the
erroneous outcome, selective enforcement, and arcane assumptions that violated
Plaintiff's Title IX rights.

160.    Because Rupprecht acknowledges that he reached the decision to impose the
fundamentally discriminatory and disparate sanction of expelling Plaintiff while giving
Ms. Koffler no sanction at all in consultation with Rovinsky, Plaintiff alleges that
Rovinsky also acted with race and sex biases against Plaintiff and in violation of
Plaintiff's contractual rights with Drexel.

161.    Had Drexel properly handled the investigation and hearing of these complaints the
adjudicator would have realized that in his post-traumatic grief and shame, Plaintiff
became Ms. Koffler's slave, not her stalker, and that certainly none of the Plaintiff's
actions during the time Ms. Koffler terrorized him constitute affirmation.

162.    Professor David Rudovsky and 15 other tenured members of the Penn Law faculty
have protested from the start the many, glaring, massive flaws of this style of in-house,
ad-hoc, and sui-generis Sexual Assault adjudication stating them in a signed open letter
available at http://media.philly.com/documents/OpenLetter.pdf.

163.    In that context, the adjudicator used an illegal standard and looked only at a
manipulated and biased file; even then she found both Plaintiff and Ms. Koffler guilty of

sexual harassment; but she did not find Ms. Koffler guilty of what she clearly

was--sexually assaulting plaintiff on August 18, 2015 because Drexel manipulated the

file to make the adjudicator believe that Plaintiff had ratified that assault.

164.    It was Drexel's bias that resulted in the expulsion of Plaintiff while Ms. Koffler

suffered no sanction at all also because she benefited from that bias (see No. 79, supra).

**G.**    **Drexel Discriminates Against Plaintiff's  Appeal of Ruprecht's Sex-based and**

**Race-motivated Disciplinary Sanction.**

165.    Following Judge Greenspan's finding Ruprecht expelled Plaintiff and gave Koffler a

sanction that Drexel itself, through Judge Temin's review of the plaintiff's appeal, admits

was no sanction at all.

166.    Ms. Koffler and Plaintiff appealed this situation.

167.    Plaintiff asked to be forgiven for something he had not done, and to be allowed to

rejoin his life and his friends, even though his rapist would go and in fact is unpunished.

168.    Drexel conducted a review of the severity of Ruprecht's sanctions and in a scathing

opinion Judge Temin found it disparate in that Rupprecht did not punish Koffler.

169.    Undeterred in his blatant discrimination against plaintiff, in spite of Drexel's own

reviewing Judge Temin finding that Koffler's so-called sanction was disparate and

illusory, all that Rupprecht did was still tinged with animosity.  Rupprecht forced the

plaintiff to withdraw from Drexel for being found guilty of sexual harassment and

stalking,  all the while completely failing to discipline Koffler not just for her rape of the

Plaintiff, but also for the very same violation she was found guilty of: sexual harassment.

170.    This discrimination did nothing to solve Drexel's unfair destruction of Plaintiff's career or to in any way compensate for the profound humiliation and discrimination that the Plaintiff had and continues to experience as a result of Drexel's biases and breaches.

171.    In Ruprecht's world a man of color is guilty and a white woman is accommodated.

172.    Rupprecht biased punishment after the appeal left Plaintiff with an unfinished semester of work, expelled from school, and publicly identified as a criminal.

**H. Defendant's Actions Severely Damage Plaintiff's Entire Future.**

173.    As a result of defendant's actions, Plaintiff's academic career is ruined and without a Drexel degree his education and his earnings capacity are forever diminished.

174.    Currently, Plaintiff's education is substantially depreciated because of the expulsion even if termed a "voluntary withdrawal" and his educational record still reflects a disciplinary breach that he did not commit which prevents his future education.

175.    Plaintiff suffered and continues to suffer the most intense and profound forms of emotional distress as a result of the discrimination described in this complaint.

176.    Currently, Plaintiff's transferability to a comparable school has substantially ended.

177.    Plaintiff will forever have to explain why his record shows he did not graduate from Drexel University which will negatively impact his lifetime earnings.

178.    As any person who has experienced this discriminatory trauma would, Plaintiff needs and will require therapy and other health care for the rest of his life.

179.    Today, in this courthouse, Plaintiff complains against Ruprecht, Rovinsky, Perez, and Lis seeking to hold their employer, defendant Drexel University, liable for these catastrophic injuries and asks for a jury verdict to revindicate his life.

## V.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violation of Title IX--Reverse Discrimination

180.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

181.     The 2nd Circuit's game-changing decision in Doe v. Columbia University (831 F.3d

46 (2nd Cir. 2016) ("Columbia") has incorporated the McDonnell Douglas Title VII

burden shifting standard for pleadings of reverse Title IX discrimination claims.

Columbia at 55-56, accord, John Doe v. Regents of the University of California,

(2:15-cv-02478 Order Denying Motion to Dismiss, June 8, 2017) which adopted this

standard.  While none of those decisions is binding on this Court, the question of how to

state a reverse Title IX claim is of first impression in the 3rd Circuit and thus plaintiff

relies on and invokes this precedent now to plead that Drexel reverse discriminated

against him because of his gender thus violating his rights under Title IX.

182.     First, plaintiff avers that Drexel's finding of his guilt stems from facts that cast

articulable doubt on the very same outcome of this disciplinary proceeding as stated in

Nos. 3, 25 (a)-(e), 26 (a)-(f), 32-34, 39, 40, 43, 46, 55-60, 63, 66, 79, 97, 99, 100, 101,

106, 109, 110,111, 115, 125, 129, 131, and 146 among other averments of this complaint

and include specific, documented, dispositive, outrageous instances of suppression,

manipulation, hearsay and other inaccuracies many happening in front of Plaintiff's

mother and or of his former counsel. (Columbia, id).

183.     Second, plaintiff avers that in addition to having cast doubt on the accuracy of the

outcome of Drexel's disciplinary proceeding in No. 182, he has stated facts sufficient to

establish that the disciplinary proceeding' handling and outcome was erroneous due to Drexel's bias against plaintiff's sex as stated in Nos. 5-7, 27, 29, 35, 37, 38, 41, 47, 52-54, 61, 69, 70, 78, 80, 83, 85, 88, 93, 94, 96, 98, 104, 105, 106, 118-120, 123, 124, 133, 142, 147, 155, 158 and 169 of this complaint and including specific documented uses of plaintiff's male gender in a negative and of Ms. Koffler's female gender in a positive way. (Columbia, at 57).

184.    Drexel caved in to the national, political, and media pressure to stop ignoring sexual assault on campus that schools experienced during the Obama administration because of truly horrible stories of assault.  Saldy this history biased the process against Plaintiff. Nos. 71-77 of this complaint specifically aver the media sources of this political pressure.

185.    Drexel was particularly vulnerable to cave in to this pressure and to bias the process against the plaintiff, a male of color, because of the animus of its staff, as described in Nos. 106, 110, 114, 117, 121 (a)-(e), 112, 134, 135, 137, 143-145, 155, 158 and 169 of this Complaint and because they are not trained, or well trained, in Title IX, as described in Nos. 92, 94, 102, 107, 115, 118, 137, 143, 144, 149 and 161 of this Complaint.

186.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et seq. ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

187.    Drexel receives extensive federal funding.

188.    Not paying attention to sexual assault would jeopardize that funding.

189.    Title IX is enforceable through an implied private right of action affording an

individual discriminated against due to his gender damages and equitable relief.

190.    Courts recognize violations on reverse Title IX claims under several theories

including erroneous outcome, selective enforcement, arcane assumptions and deliberate

indifference. Plaintiff makes a claim of discrimination under each of those theories.

191.    Both the Department of Education and the Department of Justice have promulgated

regulations under Title IX that require a school to "adopt and publish grievance

procedures providing for the prompt and equitable resolution of student...complaints

alleging any action which would be prohibited by" Title IX or its regulations. 34 CFR

Sec. 106.8(b) (Dep't of Ed); 28 CFR Sec. 54.135(b) (DOJ).  These actions include any

form of sexual touching.  See generally, U.S. Dep't of Education, Office for Civil Rights,

Revised Sexual Harassment Guidance:  Harassment of Students by School Employees,

Other Students, or Third Parties--Title IX (2001) at 19-20, 21 & nn. 98-101.  (Guidance)

192.    The procedures adopted by Title IX covered school like Drexel, must not only

"ensure the Title IX rights of the complainant," but must also "accord[] due process to

both parties involved."  (Guidance, id at 22).

193.    These procedures that in the view of the Guidance accord due process when well

instituted and aptly followed, must include, at a minimum: "**Adequate, reliable and**

**impartial investigation of complaints, including the opportunity to present witnesses**

**and other evidence"**.  (Guidance, id at 20).  [emphasis added].

194.    A school also has a Title XI mandated obligation to make sure that all persons

handling these procedures "have adequate training as to what conduct constitutes sexual

harassment, which includes 'alleged sexual assaults'".  (Guidance, id at 21).

195.    Based on the foregoing averments of fact, defendant Drexel has deprived Plaintiff on

the basis of his sex of his Title IX rights, of his statutory due process rights, and to equal

protection through the improper, malicious, sex-based application of its policies for

handling sexual assault which led to the erroneous outcome in this matter.

196.    Information concerning the outcome of disciplinary proceedings involving male

students as compared to female, and students of color as compared to other students, is in

Drexel's exclusive possession and control. Upon information and belief, statistics within

Drexel's exclusive possession and control will show a pattern of intentional

discriminatory conduct and selective enforcement based on sex.

197.    Drexel initiated and conducted the investigation and subsequent hearing of Ms.

Koffler's complaint in a manner that was biased against Plaintiff due to his sex.

198.    Plaintiff was found to have committed an offense, stalking, by an uninformed third

party who imposed an illegal standard of proof--preponderance--, relying on a flawed and

deeply biased file that suppressed plaintiff's terror of and complaints against Koffler, and

took at face value Koffler's claim that plaintiff stalked her after she raped him.

199.    The third party was unaware that Drexel suppressed evidence, including dispositive

parts of Plaintiff's own complaint that Ms. Koffler sexually assaulted and then retaliated

against him clearly causing a hostile environment for him in the meantime, and,

dispositively, that Plaintiff's first report of this rape went uninvestigated.

200.    The independent adjudicator never heard "all the evidence" thus she could not rule on a "preponderance of the evidence."

201.    The very clear fact that Plaintiff complained that Ms. Koffler had assaulted him on August 18, 2015 was simply ignored, suppressed, and precluded from the record.

202.    On information and belief, a female student at Drexel has never been disciplined, much less expelled, for alleged sexual misconduct and now Plaintiff asks that Ms. Koffler be disciplined for sexually assaulting him on the night of August 18, 2015.

203.    Drexel's policies and procedures have deprived Plaintiff, on the basis of his sex, of the right to confront and/or cross-examine his accuser.

204.    Due to Plaintiff's gender, Drexel imposed sanctions on Plaintiff that were excessively severe and to the benefit of Ms. Koffler because of her sex in violation of Title IX.

205.    As a direct and proximate consequence of Drexel's Title IX violations, Plaintiff has sustained significant damages including expulsion from Drexel.

206.    Plaintiff has also suffered monetary damages, profound emotional distress, loss of educational opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the following relief:

(a)    Mandate that Drexel correct Plaintiff's academic and/or disciplinary record to remove any findings issued by the University with respect to all the charges levied against him by Drexel and/or Ms. Koffler which led to his suspension and to his expulsion, even if later styled as a "voluntary withdrawal";

(b)      Mandate that Drexel verify this correction by providing Plaintiff with a notarized

letter confirming that any findings with respect to these charges have been expunged

from Plaintiff's academic and/or disciplinary record;

(c)      Mandate that Drexel immediately allow Plaintiff to re-enroll in the University to

complete his education with credit for the few courses Plaintiff has taken to date;

(d)      Process Ms. Koffler for her assault of Plaintiff on August 18, 2015 and for

presenting a false claim on it 363 days later;

(e)      Award Plaintiff compensatory damages in excess of Seventy-Five Thousand

Dollars ($75,000.00), in addition to attorneys' fees, expenses and costs; and

(f)      Award Plaintiff any other and further relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION

### Violation of Title IX--Deliberate Indifference to Plaintiff's Sexual Assault Claim.

207.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

208.    Drexel's institutionalized gender bias against males bringing accusations of sexual

assault against females results from classifications based on archaic assumptions that

leads to erroneous outcomes favoring females over males.

209.    Drexel treats female complainants differently and significantly better than male

complainants of sexual assault based on the University's outdated attitudes about females

and overbroad generalizations about male and female sexual traits and behaviors.

210.    Drexel treats female respondents of sexual assault differently and significantly better

than male complainants of sexual assault based on the same attitudes and generalizations.

211.    Drexel maintained a sexually hostile environment for plaintiff from the time that Ms. Koffler raped him and then increased this hostility suspending and then expelling him.

212.    The outcome of the Drexel's flawed proceeding against Ms. Koeffler was clearly erroneous, and was motivated on the basis of sex.

213.    From the start, Drexel was on notice of, and was deliberately indifferent to, plaintiff's sworn in Court testimony that Ms. Koffler sexually assaulted him (**Exhibit D**, 59, 21-25, 60, 1-4) and of Ms. Koffler's admission that she had "misbehaved" and that Plaintiff said "no" (**Exhibit F**).

214.    The serious flaws in Drexel's investigation, the lack of equity and fairness, and the gender bias in favor of females infused the process.

215.    Drexel's implementation of the Disciplinary Procedures against Ms. Koeffler was motivated by and premised on archaic assumptions and stereotypical notions of the sexual behavior of male and female students- i.e., male students are perceived as sexual aggressors and perpetrators and female students are perceived as sexual victims.

216.    The fact that Drexel's own review of Ruprecht's punishment states that Rupprecht did not punish Koffler at all is evidence that Drexel discriminated against Plaintiff.

217.    Drexel''s conduct was so severe, pervasive, and objectively offensive that it denied the Plaintiff equal access to education that Title IX is designed to protect.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the following relief:

(a)     Mandate that Drexel correct Plaintiff's academic and/or disciplinary record to remove any findings issued by the University with respect to all the charges levied by Ms. Koffler against him;

(b)     Mandate that Drexel put a finding of sexual assault on Koffler's record;

(c)     Mandate that Drexel verify these corrections by providing Plaintiff with a notarized letter confirming that any findings with respect to these charges have been expunged from Plaintiff's record and have been marked on Koffler's record;

(d)     Mandate that Drexel immediately allow Plaintiff to re-enroll in the University to complete his education with credit for the few courses Plaintiff has taken to date;

(e)     Award Plaintiff compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to attorneys' fees, expenses and costs; and

(f)     Award Plaintiff any other and further relief that the Court deems just and proper.

### THIRD CAUSE OF ACTION

### Violation of Title VI

218.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

219.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq et seq. ("Title VI"), provides in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

220.    Based on the foregoing averments of fact, defendant Drexel has deprived Plaintiff on the basis of his race (South Asian) and national origin (Indian) of his rights to due process

and to equal protection through the improper, malicious, racist, or deliberately indifferent application of its policies for handling complaints of sexual assault against and by him.

221.    Drexel has discriminated against Plaintiff, on the basis of his race and national origin, through discriminatory, race-based implementation of Drexel's policies and procedures that comparators, white males also accused of assault, did not experience.

222.    Drexel has violated Plaintiff's rights to be free from race based discrimination under Title VI of the Civil Rights Act of 1964 including, as provided under 20 CFR Sec. 42.101 et seq., at 42.104.(b):

> (i) Denying Plaintiff services and access to financial aid given to other students.
>
> (ii)  Giving Plaintiff different services than those given to the other students.
>
> (iii) Segregating and treating Plaintiff separately from the other students.
>
> (iv) Treating Plaintiff differently from other students, including those white males facing allegations of sexual assault, in terms of his enrollment.
>
> (v) Denying Plaintiff's ability to participate in Drexel programs including ancillary academic activities like the sports facilities and social spaces.

223.    Drexel initiated and conducted the investigation and subsequent hearing of Ms. Koffler's complaint in a manner that was biased against Plaintiff due to his race and national origin and which is in shocking difference from the investigation and treatment by Drexel of white male sexual assault respondents and white female respondents (specifically Ms. Koffler).

224.    Plaintiff avers inaccuracies that cast doubt on the outcome of this process, in the assignment of discipline and in the review of the appeal at No. 184.

225.   Plaintiff avers that these inaccuracies suggest Drexel's racial bias at No. 185 and 187.

226.   All of these race motivated actions violate Drexel's contract with Plaintiff, federal and state guidelines on race and education, and demonstrate defendant's race-motivated discriminatory bias against Plaintiff, in violation of Title VI.

227.   To post a flyer throughout Drexel's campus with plaintiff's face, FERPA-protected information, and the legend "harassing and stalking" before the adjudication of this matter, is direct evidence of race discrimination particularly because Drexel did not publish a similar flyer for Koffler, an accused and admitted rapist who violated a Court-issued PFA (**Exhibit J**) and was then found guilty by Drexel of harassment.

228.   The racial and national discrimination which Plaintiff seeks to redress constituted exclusion from participation in federally funded matters; practices which are made unlawful by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d.

229.   As a direct and proximate result of Defendant Drexel's unlawful exclusionary practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has been deprived of economic and noneconomic benefits including, but not limited to inability to study and to finish his studies, wage loss, failure to grow academically and professionally, pain and suffering, mental anguish, humiliation, loss of fringe benefits, painful embarrassment among his friends and peers, disruption of his personal life and loss of enjoyment of life.

230.   The above-mentioned acts were willful, wanton, malicious and oppressive and done with reckless disregard for Plaintiff's federally protected rights, therefore justifying the imposition of punitive damages.

**WHEREFORE,** As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial in excess of $150,000.00, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.  Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action as well as to enter any equitable relief that this court may deem proper.

## FOURTH CAUSE OF ACTION

### Violation of Section 1981 of the Civil Rights Act

231.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

232.    Plaintiff is a male of color and a US Citizen of South Asian race and Indian national origin who had a contract with Drexel University to obtain education, to be protected from sexual harassment both as complainant and respondent, and to receive housing.

233.    42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In Runyon v. McCrary, 427 U.S. 160 (1976), the Supreme Court held that Section 1981 regulated private conduct as well as governmental action.

234.    In violation of its own contract and policy, Drexel investigated, evaluated and suspended Plaintiff based on an inherently false complaint from Ms. Koffler, herself a white complainant, while completely ignoring Plaintiff's complaint of the same act against Ms. Koffler.  In that process Drexel suppressed evidence and applied different standards for Plaintiff and to Ms. Koffler because of his race.

235.    Drexel also evicted Plaintiff once and segregated him from the educational environment, something not done to white respondents of sexual assault claims including, specifically, Ms. Koffler.

236.    In all these investigations and determinations Drexel treated Plaintiff in a discriminatory manner that violated their contract under a racial motivation.

237.    Plaintiff's race and national origin were motivating factors in Drexel's handling of the sexual assault complaint from a white female, which led to Plaintiff's suspension and expulsion all the while ignoring and undermining plaintiff's complaints against Koffler.

238.    In addition Plaintiff re-alleges and incorporates by reference all the race and national origin based averments in his second cause of action as if stated here at length.

**WHEREFORE,** As a result of the foregoing, Plaintiff  is entitled to damages in an amount to be determined at trial in excess of $150,000, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements as well as to punitive damages.  Plaintiff requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action and requests any other equitable relief that this court may deem proper to ensure that Plaintiff is not discriminated against on the basis of his race and or their national origin

## FIFTH CAUSE OF ACTION

### Breach of Contract

239.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

240.     At all times relevant hereto, a contractual relationship existed between Drexel and Plaintiff through, inter alia, Drexel's Student Handbook and Drexel's Policies and Procedures including its sexual assault and investigation policy.

241.    Drexel was required to act in accordance with that contract.

242.    For all the reasons set forth above, Drexel has materially breached its contracts with
Plaintiff by failing to comply with policies and procedures governing sexual misconduct
and racial discrimination.

243.    As a direct, proximate and foreseeable consequence of Drexel's numerous material
breaches, Plaintiff has sustained significant damages including, but not limited to, having
an academic and/or disciplinary record(s) indicating that he was found to have committed
sexual misconduct.

244.    Plaintiff was also suspended and then expelled from Drexel as a consequence of these
breaches with a resulting loss of lifetime earnings, loss of education opportunities, pain
and suffering, and other direct and consequential damages.

245.    Plaintiff is entitled to recover damages for Drexel's breach of its contractual
obligations and duties including specific performance of the contract.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor against
Drexel and provide the relief requested in the first cause of action and any further relief this court
may deem just and proper including specific performance and any other equitable relief.

### SIXTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

246.    Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

247.    Drexel breached and violated the covenants of good faith and fair dealing implied in
its agreements with Plaintiff by mishandling the investigative, evaluative and
adjudicative part of the sexual assault complaint, by ignoring Plaintiff's complaint of

50

assault against Ms. Koffler, by suppressing evidence, by meting out a disproportionate

sanction of expulsion while Ms. Koffler was not punished, and by ignoring the many

reasons why Plaintiff's appeal should have been granted as averred in this complaint.

248.     The fact that Ruprecht added hearsay evidence that was irrelevant and that Rupprecht

then turned against the plaintiff is evidence of breach of this covenant because it is not

good faith or fair dealing to undermine the adjudication process and have a second set of

reasons for only punishing Plaintiff and not Ms. Koffler who was found responsible and

who had admitted to raping the Plaintiff.

249.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained

tremendous damages, including without limitation emotional and economic distress.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor against

Drexel and provide the relief requested in the first cause of action and any further relief this court

may deem just and proper including a finding of Drexel's breach of its covenants of good faith

and fair dealing as well as specific performance and any other equitable relief.

### SEVENTH CAUSE OF ACTION

### Estoppel and Reliance

250.     Plaintiff Doe incorporates each of the above paragraphs as if fully set forth herein.

251.     In the event the Court were to find that no contracts exist between Plaintiff and

Defendant, Drexel, through but not limited to its regulations, standards, procedures and

policies, made representations to Plaintiff, independent of any express contractual

promises, that Drexel expected or should have expected would induce Plaintiff to apply

to and continue to enroll at the University.

252.    Similarly, Plaintiff gave up competing offers from prestigious schools because he

believed on and acted based on the belief he obtained from Drexel's representations.

253.    Plaintiff relied on Drexel's expressed and implied promises that he would not be

discriminated against based on his sex or his race by the University and enrolled in it.

254.    Plaintiff justifiably relied on Drexel's express and implied promises to his detriment,

as Drexel failed to adhere to them.

255.    As a direct, proximate and foreseeable consequence of Drexel's conduct, Plaintiff

sustained significant damages including, but not limited to, possessing an academic

and/or disciplinary record(s) that improperly includes a notation indicating that he was

found to have committed sexual misconduct.

256.    Plaintiff has also suffered monetary damages, emotional distress, loss of education

opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his

favor against Drexel and provide the relief requested in the first cause of action and any further

relief this court may deem just and proper including a finding that Drexel induced Plaintiff to

rely on its promises to achieve his enrollment and any other equitable relief.

## EIGHTH CAUSE OF ACTION

### Unfair and Deceptive Trade Practices

257.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

258.    The Pennsylvania Uniform Trade Practices and Consumer Protection Law, 73 P.S.

§201-1 et seq, creates a private right of action for consumers of Pennsylvania-based

services, such as Plaintiff's consumption of Drexel's educational services, whose

characteristics have been misrepresented, including "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."

259.    Defendant Drexel has engaged in acts and practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances because they create the likelihood of confusion and misunderstanding:

a.      by causing Plaintiff to believe that Drexel would follow its policies both as they were provided to Plaintiff and as they were stated in the Policies and Procedures and elsewhere throughout the Drexel web page and printed materials.

b.      by causing Plaintiff to believe that if he accepted Drexel's offer of enrollment and paid the related tuition, Drexel would uphold its obligations, covenants and warranties to Plaintiff as described in its policies.

260.    Defendant had no intention of following and in fact did not follow its own policies and procedures nor did it uphold its obligations for Plaintiff's disciplinary actions.

261.    It is particularly deceptive, as a practice, for Drexel to have taken Ms. Koffler's allegations at face value, for Drexel to have added factors to punish plaintiff after the adjudication, for Drexel to have put the burden on Plaintiff that he did not stalk Koffler and for Drexel to state it has a Title IX team and policy when it clearly does have a policy but it does not have a properly trained, unbiased team.

262.    President Fry's letter that Drexel should be at the forefront of Title IX enforcement is deceptive in this context.  (**Exhibit I**).

263.    In addition it is deceptive, as a practice, for Drexel to prosecute the accusation against Plaintiff while having been deliberately indifferent to Plaintiff's symmetrical accusation against Ms. Koffler which should have been equally investigated but was not.

264.    Based on the foregoing defendant Drexel engaged in deceptive or unfair trade practices in violation of the UTPCPL, 73 P.S. §201-1 et seq.

265.    As a direct, proximate and readily foreseeable consequence of Drexel's aforementioned conduct in violation of the UTPCPL, Plaintiff has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation of sexual misconduct.

266.    Plaintiff has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action, treble damages as allowed under the UTPCPL, attorney's fees as allowed under the UTPCPL and any further relief this court may deem just and proper including a finding that Drexel induced Plaintiff to rely on its promises to achieve his enrollment and any other equitable relief.

**NINTH CAUSE OF ACTION**

**Negligence**

267.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

268.    In the event the Court were to find that no contracts exist between Plaintiff and Defendant, Drexel owed duties of care to Plaintiff independent of any contractual duties including, but not limited to an academic environment free of sexual hostility where

sexual misconduct policies and procedures are fair and reasonable; including providing

him with support through trained and non-biased administrators.

269.     Based on the aforementioned facts and circumstances, Drexel has breached its duties

of care owed to Plaintiff.

270.     As a direct, proximate and readily foreseeable consequence of Drexel's

aforementioned conduct, Plaintiff has sustained significant damages including, but not

limited to, possessing an academic and/or disciplinary record(s) that improperly includes

a notation indicating that he was found to have committed sexual misconduct, harassment

and/or other related offenses.

271.      Plaintiff has also suffered monetary damages, emotional distress, loss of education

opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his

favor against Drexel and provide the relief requested in the first cause of action and any further

relief this court may deem just and proper including a finding that Drexel induced Plaintiff to

rely on its promises to achieve his enrollment and any other equitable relief.

## TENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

272.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

273.     Defendant Drexel owed duties of care to Plaintiff as averred in the eighth cause of

action

274.     Defendant Drexel breached its duties owed to Plaintiff.

275.    As a direct and proximate result of this this breach and of all the conduct alleged

throughout this complaint, Plaintiff sustained tremendous damages, including, without

limitation, emotional distress, psychological damages, loss of reputation, loss of

educational opportunities, economic injuries and other direct and consequential damages.

**WHEREFORE**, as a result of the foregoing, Plaintiff is entitled to Damages in an amount to be

determined at trial, plus pre-judgment interest, attorneys fees, expenses, costs and disbursements.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his

favor against Drexel in compensation in an amount in excess of $150,000.00 in addition to

pre-judgment interest, attorneys' fees, expenses, costs, disbursements, and any other further

relief the Court deems just and proper including equitable relief.

Respectfully submitted,


/s/ Raul Jauregui

Dated:  July 31, 2017          _____

Raul Jauregui, Esq.
Law Offices
900 Market Street
PO Box 861
Philadelphia, PA 19107
(215) 559-9285
(610) 543-1501 fax
Raul.Jauregui@gmail.com

**VERIFICATION**

I, Karthik Saravanan, swear and affirm that I am the plaintiff in this complaint, that I read and reviewed this complaint, and that the matters stated in this complaint are true as well as stated either on the basis of my personal knowledge or else on the basis of my information and belief.

Dated:  July 31, 2017                    /s/ Karthik Saravanan

**PROOF OF SERVICE**

I Raul Jauregui state that pursuant to the Federal Rules of Civil Procedure I served a copy of this complaint on the defendant, Drexel University, at the below listed address:

Drexel University Office of the General Counsel
3201 Arch Street, Suite 310
Philadelphia, PA 19104




Dated:  July 31, 2017

/s/ Raul Jauregui

Raul Jauregui, Esq.
Law Offices
900 Market Street
PO Box 861
Philadelphia, PA 19107
(215) 559-9285
(610) 543-1501 fax
Raul.Jauregui@gmail.com