**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Karthik Saravanan | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| Drexel University | : | NO. 2:17-cv-03409-MAK |
| | : | |
| Defendant. | : | |

## AMENDED COMPLAINT

Karthik Saravanan ("Plaintiff") through his undersigned counsel, files this civil complaint against defendant Drexel University, and in support avers as follows:

### I.        NATURE OF THIS ACTION

1.        Drexel deprived Plaintiff of his rights under Title IX to a sexual discrimination free and under Title VI to a race discrimination free academic environment and also violated his contractual rights concerning the events that took place after J.K. sexually assaulted plaintiff in the Drexel campus where both were enrolled as undergraduates.  Throughout, defendant failed to adhere to laws, to its contract with plaintiff, and to its own policies which should have protected Plaintiff.

### II.        THE PARTIES

2.        Plaintiff is a resident of Pennsylvania, of color and of South Asian national origin.  Plaintiff was enrolled as a full student at Drexel University until defendant ended his enrollment.

3.        Defendant Drexel University (hereinafter "Drexel"  "staff" or "University") is a private university with a principal address of 3141 Chestnut Street, Philadelphia, Pa 19104.

### III.   JURISDICTION AND VENUE

4.     Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681, et seq. and 28 U.S.C.§1331. 23; and because of the race discrimination claim under Title VI of the 1964 CRA, 42 U.S.C. § 2000d et seq.

5.     Plaintiff also invokes jurisdiction under this Court's power to prevent discrimination based on race as codified in 42 U.S.C. §1981 which specifically prohibits against the use of race discrimination in the enforcement of contracts in the United States.

6.     Plaintiff invokes this Court's equitable powers under 28 USC §2201.

7.     Pursuant to 28 U.S.C. §1391, venue for this action properly lies in this district because a substantial part of the events or omissions giving rise to the claims set forth below occurred in this judicial district.

8.     Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C.§1367. 25.

### IV.   MR. SARAVANAN STATES THE 50 FACTUAL ALLEGATIONS HE IS ALLOWED IN SUPPORT OF HIS AMENDED COMPLAINT (NOS. 9 -58):

#### A.   On Title IX Reverse Discrimination Because he is a Man Drexel Reached an Erroneous Outcome in the Charging, Investigative, Adjudicative and Punitive Phases of the Disciplinary Process.

9.     Mr. Saravanan avers to satisfy the ***first prong*** of the erroneous outcome theory, consisting of "particular procedural flaws affecting the proof" *Yusuf v. Vassar* 35 F.3d 709, 715 (2nd Cir. 1994) that Ms. Perez did not write into the investigative report what

witnesses told her (See, e.g., Ex. A, 2 "Jena had misrepresented and misrecorded my statements." Ex. B, 4 "Jenna Perez neglected to write down many of the things that I told her. Many of the things of what I had told her documented Karthik's continued harm from J.K.'s harassment and the sexual assault."), prevented their review of the file investigative (id) as well as plaintiff's, and changed a deadline denying plaintiff's ability to supplement the investigative file (See, e.g., Ex. C, 2 and fn. 1, 5) which led to a flawed set of facts that became the backbone of this disciplinary process.

10.     Similarly, Drexel flawed the investigative procedure from the start when it refused to charge J.K. with what she did and Mr. Saravanan accused her of "non consensual sexual conduct" (OED-3 No. VI, P 7 in Ex D) in the context of Drexel knowing from the start that J.K. had admitted to violating Drexel's consent definition in Court (Ex. K) and of later knowing of the admission in a Snapchat (Ex. E), which merited a charge against and investigation of J.K. for "non consensual sexual conduct" which never took place because Drexel favored the woman in this matter.

11.     Finally, the fact that Drexel published inaccurate sexual assault numbers in its 2015 Clery Report which we are only able know now because Drexel's report clearly does not feature Mr. Saravanan's report against J.K. shows that Drexel's investigative disciplinary procedure is flawed (Ex. F) and that the documents and data that support or contradict further factual averments of these flaws are in Drexel's possession and control only.

12.     Mr. Saravanan satisfies the ***second prong*** of the erroneous outcome theory, consisting of "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding", *id* at 715-716 averring that, for example, Drexel's

investigation favored J.K. (a woman) who acknowledged raping (a man) Mr. Saravanan (Ex. E, Ex. K) in several ways including defending J.K. during the investigative process, taking her to Court where Drexel's employee Amy Spiller acted as J.K.'s de-facto attorney, weighing J.K'.s bald and incredible allegations against Mr. Saravanan as if they were fact, and charging plaintiff with retaliation against J.K. when all plaintiff did was follow standard court procedure after J.K. violated her PFA and stalked the plaintiff. (See, e.g., Ex. B, 2 where Mr. G.R. told Ms. Perez that "On or around September, 2016, I was present when Karthik called 911 because J.K. had violated his Protection From Abuse Order.  I recall seeing Philadelphia Police officers respond, not Drexel Police officers."  See also, e.g., Ex. B, 5 with Mr. G. R. stating to Ms. Perez J.K.'s stalking of Mr. Saravanan and how J.K. "…was very manipulative and would try to threaten Karthik into buying her gifts.  These gifts included lingerie, meals, and Karthik would use my car to personally chauffer her because she requested him to.").).

13.     Mr. Saravanan cites to statements by University's officials or members of University's disciplinary tribunal suggesting gender bias influenced the outcome of his disciplinary proceedings first pointing to Ms. Spiller who called "ludicrous" Mr. Saravanan's claim that J.K. raped him (Ex. A, 5 "[Spiller] then approached Karthik's attorney, and said 'that's ludicrous'"), then told him and his attorney that she had "never heard of a woman raping a man" even after years of service in a police department position where Ms. Spiller saw female crime victims receive no help from that department, and then proceeded to write to plaintiff that she could not assist him as she chose to assist J.K against him.

14.     As Mr. Saravanan met with Mr. Robert Lis to again state his report of rape, Mr. Lis told Mr. Saravanan and his lawyer "I have never heard of a" female raping a male, and then prejudicially characterized Mr. Saravanan's report of J.K.'s assault on him, even in spite of J.K.'s court testimony (Ex. K), as "it just seems to me like he [plaintiff] is trying to get back at her [J.K.]." Mr. Lis then admitted that was also Mr. Rupprecht's opinion. Finally Mr. Lis, just in that meeting, said to further discriminate against the plaintiff because he is a man, "I've been doing this for thirty years and I've never heard of a guy his age being so scared of a girl.". (See, e.g., Ex. C, 2, Ex. G, No. 18).

15.     The first thing that Michelle Rovinsky told to Mr. Saravanan when he entered Drexel's Title IX office to yet again try to state his report that J.K. had sexually assaulted him was "are you here to stalk J.K.?" Ms. Rovinsky then proceeded to not take plaintiff's report exhibiting a gender bias against Mr. Saravanan which makes sense given it appears that Ms. Rovinsky believes only women are victims as she is cited in a Drexel article calling sexual assault on college campuses "a national problem" because "one in five women is sexually assaulted during college, according to the U.S. Department of Justice" (Ex. H) an inflammatory statistic that the Department of Justice itself has contradicted.

16.     As she would lead and lie to Mr. Saravanan and to several pro-plaintiff witnesses she interviewed, Jena Perez asked outrageously gender biased questions that flawed the investigation favoring J.K., including asking Mr. Saravanan "why was your penis erect then? Doesn't that mean that you enjoyed it?" as Mr. Saravanan reported his rape experience to her. (See., e.g., Ms. Perez asking Mr. M. L. if he agreed that J.K. was the victim, (Ex. A, 2 "[Perez] continued to harp on this general concept of Ms. K----

being a victim, not Mr. Saravanan"), and Ms. Perez asking Mr. G. R. if he and Mr.

Saravanan generally assaulted women (Ex. B, 1 "I found this not to be true, and that

Jenna Perez was in fact asking me questions that portrayed Karthik as the perpetrator."

Ms. Perez also asked gender biased questions of M.L. (Ex. B, 3 "Jenna Perez then

proceeded to ask me if I had ever done anything like this to other women.  She asked me

if it was typical of Karthik to go out to parties and drink frequently.")).

17.    Mr. Saravanan alleges facts to support a presumption of a pattern of

gender discrimination suggesting gender bias flawed the disciplinary process against him

and in J.K.'s favor including, for example, that the investigative report which Ms. Perez

authored shows that Ms. Perez took out, omitted, or otherwise failed to investigate and

record the information that Mr. M.L. and Mr. G.R. told Ms. Perez to be put into the report;

this information favored the plaintiff and disfavored J.K. (Ex. A, 2, Ex. B, 4).

18.    Mr. Rupprecht and Ms. Rovinsky considered only the bald aggravating

circumstances that J.K. provided against Mr. Saravanan after she was found guilty of

sexual harassment, but ignored the corresponding aggravating circumstances that Mr.

Saravanan provided against J.K.  In that context, they decided to expel Mr. Saravanan

from Drexel while deciding that J.K. should not be sanctioned.  This explains why, on

April 17, 2017, Judge Carolyn Engel Temin, Appeal Adjudicator, issuing Drexel's own

review of both sanctions, admitted to Mr. Rupprecht's and Ms. Rovinsky's discrimination

against the male plaintiff and to their favoring of the female stating:

"Saravanan was given a sanction of Expulsion from the University effective

March 20, 2017. K----- was given a sanction of Disciplinary Probation made

retroactively effective to run from August 25, 2015 to August 25, 2016. Since the

sanction was imposed on March 20, 2017, it was, in effect, no sanction at all."

19.     Gender bias exists as Drexel's Public Safety has at least one deeply biased document that addresses rape on campus and shows Drexel's profound pro-female and anti-male bias, embodying the attitude of Drexel's investigative, adjudicative and punitive sexual assault apparatus. Titled "Date Rape/Acquaintance Rape" it states "no matter what, it is still rape!" and then portrays men as perpetrators, warning: "Do not let your desire control your actions" while telling women, here portrayed as the only possible victim: "Do not be intimidated into having sex." (Ex. I).

20.     Gender bias exists as Drexel was under pressure to not be investigated by OCR as shown in documents including Drexel's President John A. Fry's letter that Drexel had joined a national movement on sexual assault (Ex. J) which coincides with national press reports on this issue, Ms. Rovinsky's statement that while there are 55 universities under federal investigation "…those aren't the only institutions where sexual assault is happening" (Ex. H) implying it is happening at Drexel too, and Ms. Perez' statement to plaintiff that it was good to keep Drexel off the federal investigation list.

21.     Finally, gender bias exists at Drexel, on information and belief, and it can be inferred from Drexel's use of staff trainers like Ms. Rovinsky and of staff training materials for taking reports and carrying out investigations of on campus sexual assault that inherently portray the woman as the victim of the man; which is the gender biased staff training flaw that in part led to Mr. Saravanan's discrimination.

22.     Because the Third Circuit has not yet adopted *Doe v. Columbia University*, 831 F.3d 46 (2nd Cir. 2016) Mr. Saravanan was forced and only able to file this Amended Complaint because his Drexel friends came to his support and signed

declarations showing that what he otherwise pleads circumstantially, is true, namely that in the disciplinary process Drexel favors females, not just J.K. but others, over men, not just plaintiff but also M.L. and G.R., that Drexel specifically left out evidence from the investigation that M.L. and G.R. stated in favor of plaintiff, that Drexel assumed plaintiff's guilt in the manner in which it took the charges, conducted the investigation, and doled out his punishment.  Seen together, the testimony from M.L., G.R., plaintiff's mother, and plaintiff's former counsel, as well as the circumstantial statements and decision patterns from Drexel's staff, unquestionably ties Drexel's conduct to the intentional gender and race discriminatory animus against Mr. Saravanan because he is a man of color, which profoundly harmed him, and which makes this claim plausible.

**Drexel Selectively Enforced its Disciplinary Mechanism Against Mr. Saravanan and in Favor of J.K. During the Charging, Investigative, Adjudicative and Punitive Phases of the Disciplinary Process**

23.     J.K. is a "similarly situated" comparator for plaintiff, thereby proving Drexel's selective enforcement, not just because she is a white female who was found guilty of sexually harassing the plaintiff and not expelled, but because at the start of the investigation Mr. Saravanan accused her of several violations of Drexel's policy meant to protect him, a heterosexual man of color, from her, which Drexel did not act on. Thus, on the facts, as Drexel first documented the cross-reports, it was only J.K. who had committed the sexual assault and Drexel preferred, as on information and belief it always does, the female over the male in a sexual assault disciplinary proceeding.

24.     The disparity for comparator analysis lies in the fact that J.K. and plaintiff did not accuse each other of the same conduct, rather, Drexel made it so that they faced

the same charges by avoiding through selective enforcement of its OED-3 policy the heavier "non-consensual sexual conduct" charge against J.K. thereby favoring her by lessening her liability for more serious conduct.

25.     This pre-discovery stage record supports as plausible the view that Drexel selectively enforces the OED-3 and other policies in favor of women and against men as the record shows Drexel has a pattern of ignoring reports from men, including Mr. Saravanan and others, that females are harassing and stalking them. (See, e.g., Ex. K for Mr. Saravanan's reports, Ex. A, 4 for Mr. M.L. "For multiple months I had felt disturbed by the actions of this woman."  Ex. B, 3 for Mr. G.R. "At one point I explained to Jena Perez that I was concerned about my safety because of J.K.'s reported attempts at trying to contact Karthik…Jena Perez suggested that my request did not make sense to her.").

26.     Drexel proceeded to again treat J.K. more favorably than a man, Mr. Saravanan, during the investigation by selectively enforcing its sexual assault disciplinary policies as spelled out in the OED-3 against Mr. Saravanan only, specifically through Drexel's use of Ms. Perez, a pro-female investigator who manipulated, misconstrued or suppressed from the investigative report what witnesses for Mr. Saravanan stated (Ex A, 2, Ex. B, 4), and who apparently manufactured evidence that Mr. Saravanan ratified the sexual assault, which he did not do, and that J.K did not stalk him.  (See, e.g., Ex. A, 2 where Mr. M.L. told Ms. Perez: "One of the many incidents I brought up included knowing Karthik had been struck by Ms. K----.  Jenna [Perez] grinned sheepishly and questioned the validity of how drastic it could be as it was a female hitting a male.").

27.     Further, because as far as it is known Drexel may have given J.K. better options than it gave Mr. Saravanan, including an opportunity to withdraw instead of

being expelled, no campus ban, no sudden interruption or end to her studies there, and no plastering of the campus with a libelous flyer featuring her face, stating the fact that she was the one accused of raping and stalking Mr. Saravanan, (Ex. L), Drexel selectively enforced its discipline and privacy rules (Ex. D, OED-3, V Statement of Privacy) in J.K.'s favor, by protecting J.K. while attacking Mr. Saravanan.

28.     The fact that Judge Temin found that Drexel never imposed a sanction on J.K. even after Judge Greenspan found her guilty of sexual harassment, while disproportionately sanctioning Mr. Saravanan, exists because Drexel favored J.K. as a woman through selective enforcement of its discipline and disfavored Mr. Saravanan as a man through biased enforcement of the same rules, leading to the absurd result that a male student who complained that a female student sexually assaulted and stalked him at Drexel got expelled because Drexel saw the woman as the victim of the man whom she falsely-charged with stalking.

29.     In addition, as Mr. Saravanan is allowed to in the complaint stage, he states on information and belief that no white student, male or female, accused of the form of stalking falsely hurled at Mr. Saravanan has been expelled from Drexel under the OED-3 process.

30.     On information and belief, Drexel has precedent, a practice, or a history where it offers white respondents of OED-3 complaints, including J.K., the opportunity to withdraw first, so there is no negative finding on their record, which Drexel--again displaying selective enforcement--did not offer to Mr. Saravanan until after Judge Temin found "no sanction at all" (No. 18, supra) and by the time there already was a negative finding on his record that will harm him forever.

**B.     On Title IX Discrimination Because he is a Victim of Rape**

**Drexel Acted with Deliberate Indifference to Mr. Saravanan's Reports of Sexual**

**Assault**

31.     On August 18, 2015, J.K. sexually assaulted Mr. Saravanan in the Drexel

campus while they were both enrolled students, and she then further victimized him with

a pattern of bullying, stalking, ridiculing, and terrorizing, including slapping him, in order

to prevent him from reporting to Drexel this ordeal.

32.     Naturally, before J.K. complained to Drexel that she was exhausted from

dealing with him because she believed Mr. Saravanan was a risk to himself (See, e.g., Ex.

A, 3 where Mr. M. L. states "Ms. [J.K.] falsely led me to believe that Mrs. Saravanan was

a threat to himself."), Mr. Saravanan had reported the fact that J.K. sexually assaulted

him once to a professor and then to Drexel at least two times. First he telephoned

Drexel's OED Office in October, 2015 where he spoke to a woman who suggested he call

for a police escort. Second he telephoned the OED Office during January, 2016 and not

just reported his having been assaulted but reported that he believed that J.K. had

assaulted other men on campus.  OED responded that the complaints could not be

investigated unless the other victims came forward.  (See, e.g., Ex. G, No. 4 stating that at

that time Mr. Saravanan also confided in his mother including complaining to her that

Drexel had not helped him).

33.     Drexel's choice to do nothing when first Mr. Saravanan and later, during

the investigation others confirmed these reports against J.K. constitutes its official

decision not to remedy the hostility and a clear cut violation of Mr. Saravanan's Title IX

rights as a victim of sexual assault who reported to the school.  (See, e.g., Ex. B, 3 where

Mr. G.R. states "I explained to Jenna Perez that the sexual assault was so severe and harmful to Karthik that it had affected his ability to perform to his full capabilities academically and during his co-op.").

34.     Doing nothing to protect Plaintiff defined Drexel's behavior throughout, as on or about August 17, 2016 Plaintiff gave Mr. Lis service of process documents to be served on J.K. as a result of her violation of the PFA, and told him he needed protection from her, which Mr. Lis refused to provide, stating with a gender biased deliberate indifference:  "I don't think we do that for guys, I am pretty sure that's for girls only, but let me check that and I will get back to you."  (See, e.g., Ex. A, 4 where Mr. M.L. states his own experience of Drexel's deliberate indifference to his plight on a similar complaint against a female Drexel student: "I was not offered anything such as a Title IX investigation, even when they were there for that incident" (his then girlfriend's suicide threat)).

35.     After J.K. complained to Drexel, Mr. Saravanan extensively reported his experience of being the victim of J.K.'s sexual assault and stalking to Robert Lis who then stated to Mr. Saravanan that he was in the wrong office to file his report of sexual abuse against J.K. and thus did nothing to protect him other than send him to the Philadelphia Police SVU, all the while humiliating his mother (Ex. G, Nos.17, 26).

36.     Next, Mr. Saravanan reported that J.K. sexually assaulted him to Ms. Perez, to Ms. Rovinsky, and to Mr. Rupprecht all of whom had notice by that time of the sworn testimony both Mr. Saravanan and J.K. had stated in Philadelphia family court in front of Ms. Spiller (Ex. K) as well as later possession of the Snapchat (Ex. E) where J.K. admits to sexually assaulting Mr. Saravanan.  They did nothing to protect Mr. Saravanan

or to return him to his proper status as a fully enrolled student at Drexel who needed

protection from J.K., his assailant who happens to be a woman.

37.     Each of the persons who received the reports from Mr. Saravanan that J.K.

sexually assaulted him, or slapped him, or terrorized, bullied and ridiculed him in

connection with the sexual assault, including the two OED employees who took his

telephone report, Ms. Spiller Mr. Lis, Ms. Perez, Mr. Rupprecht and Ms. Rovinsky, is a

Drexel employee with authority to institute corrective measures given Mr. Saravanan's

reports, and who was deliberately indifferent to his report of that misconduct and his

request for and right to be protected from J.K.

### C.     On Title VI and Section 1981, Because he is not White,

### Drexel Intentionally Discriminated Against Mr. Saravanan

38.     Mr. Saravanan had a contract and was enrolled under it with good

standing at Drexel and suffered adverse actions including segregation, suspension,

expulsion and ridicule through Drexel's race-motivated conduct after he was falsely

accused of sexually harassing and of stalking J.K., as well as when Drexel undermined,

retaliated against, and ignored him with deliberate indifference because he dared to

accuse J.K. of having sexually assaulted and stalked him.

39.     Drexel staff involved in the charge, investigation, and punishment phases

of this matter, all of them White or Latino, showed racist animosity against Mr.

Saravanan, his lawyer (Ex. C), and his mother (Ex. G), threatening him (a native English

speaker) with English lessons in race-bigoted statements from Mr. Lis, next taunting and

ridiculing him (a colored victim of rape) through race-prejudiced, enabling statements

from Ms. Perez, (Ex. C), all the while segregating him from campus, and publicly

labeling him a predator in a flyer posted before the charges had been filed, and not

posting a similar flyer for J.K. who at that time had the very same "active PFA Order"

issued against her but is white. (Ex. L).

40.     Drexel's staff involved in the charge, investigation and punitive phases of

this matter incredibly found that J.K., who is white, had what she never has or ever will

have—a scintilla of credibility—which suggests that their racism against Mr. Saravanan

motivated their believing J.K. and ignoring J.K.'s admissions that she sexually assaulted

plaintiff (Ex. K, Ex. E), and their ignoring the information Drexel received from Mr.

Saravanan's witnesses specifically affecting J.K.'s credibility including that it was J.K.

who stalked and abused plaintiff to keep quiet about her assaulting him, and that she is

"manipulative".  (See, e.g., Ex. A, 3, where Mr. M. L. states "She [J.K.] said that Karthik

would be stupid and crazy to report a sexual assault against her and that he knew better

than to do that….Mr. Saravanan shared with me that Ms. K---- was threatening to tell

their social group that Mr. Saravanan was mentally disabled or a homosexual." And see

Ex. B, 5, where Mr. G.R. states "I told Jenna Perez that I understand that J.K. was very

manipulative and would try to threaten Karthik into buying her gifts.").

41.     Displaying a race-motivated antagonistic pattern of decision making that

harmed Mr. Saravanan only, Drexel consistently treated him as a dangerous man of color

who required subjugation; actually hand cuffing and removing him from his dorm (See,

e.g., Ex. A, 5 where Mr. M. L. states "In August of 2016, when I was riding the elevator

in my apartment, the door opened and I saw two police officers escorting Karthik.

Karthik said 'she violated me you have this backwards.' And the Drexel police said

"yeah, yeah, sure she did!' It sounded like a sarcastic remark and these two police

officers laughed at each other."), only to again threaten him with hand cuffing while he was inside the Philadelphia CJC applying for an emergency PFA against J.K.

42.     In addition, to circumstantially state Drexel's racism against him, Mr. Saravanan avers that it is a fact that Schools in the US such as Drexel have a pattern of intentionally discriminating against male students of color like Mr. Saravanan by applying harsher discipline to them than to their white comparators. (*See*, e.g., Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline, at 3-4 (Jan. 8, 2014), available at: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf (last viewed on Feb. 10, 2017), and in Drexel's case this racist pattern of intentional harsher application of discipline to its male students of color should be inferred from at least two other former Drexel students of color who have sued Drexel in this Court, first alleging that Mr. Rupprecht sought to entrap Mr. Osei, who is Ghanaian, (*Osei v. Drexel et al.*, 2:14-civ-03414, ECF 1, No. 58-61), refused to investigate what Mr. Osei reported to him (id, No. 65-68), and retaliatorily increased Mr. Osei's punishment while allowing comparators to withdraw (id, No. 125) all averred with racist animus, and second alleging that Ms. Rovinsky acted with racist animosity when she allegedly violated Drexel's policy of fairness against Mr. Kandjabanga who is Black (*Kandjabanga v. Drexel et al.*, 2:16-cv-00423, ECF 1, No. 268) and made allegedly false statements to OCR about his complaints against Drexel (id No. 284, 301).

43.     Mr. Saravanan further pleads that Drexel acted with intent to discriminate against him based on his race as shown through the timing of Drexel's actions and the ongoing antagonism that Drexel's staff victimized plaintiff with.  Drexel's timing includes segregating him from campus as soon as it became apparent he was complaining

against J.K. (No. 41) and Mr. Rupprecht's refusal to consider the aggravating circumstances plaintiff timely stated against J.K. at the punitive phase (No. 18), while Drexel's staff antagonism includes humiliating acts beyond their imposition of a greater sanction on plaintiff like calling his report ludicrous (No. 13), telling him if he was stalking her rather than reporting his victimization (No. 15), threatening him with handcuffing inside the Philadelphia CJC (No. 41), threatening him with English lessons (No. 39), posting a flyer only against him and not J.K (Ex. L) when she was equally accused and restrained under a PFA and other acts described in this Amended Complaint (Nos. 9, 10, 14, 18, 26, 27, 30, 33).

### Drexel Intentionally Violated Section 1981

44.     While the mere fact that J.K. is a different race than Mr. Saravanan and did not receive the same sanction from the University under their contract may not demonstrate "an intent to discriminate on the basis of race" by Drexel as required to satisfy a § 1981 claim at summary judgment, at this complaint stage Mr. Saravanan again incorporates the argument that J.K. would be a perfect comparator to him had Drexel actually charged and investigated her for everything (including non-consensual sexual conduct) that she would have been charged with absent Drexel's preference for her gender and her race over Mr. Saravanan's (Nos. 23, 24).

45.     Mr. Saravanan states on information and belief that non-minority respondents of sexual assault, stalking, or their combination are treated better than he was treated as he responded to these charges; Drexel's better treatment is believed to involve Drexel's practice of offering the responding student the opportunity to withdraw and keep a clean academic record rather than go through the disciplinary process.  Drexel did not

make that offer to Mr. Saravanan at least in part motivated by animosity to his race and that constitutes the origin of the more severe, intentionally racist sanction he experienced.

### D.     On State Law Claims of Breach of Contract and Violation of the UTPCPL Drexel Breached Several Provisions of Its Contract with Mr. Saravanan.

46.     From enrollment time, Drexel offered and Mr. Saravanan accepted a contract with essential terms stipulating promises where Drexel is obligated to perform duties to Mr. Saravanan to the letter and in good faith.

47.     A verbatim recitation to identify for Drexel of some of its promises includes a promise that Drexel's Title IX policy is enforced in a non discriminatory manner in terms of the race and gender of all parties (OED-3, IV "Notice of Non-Discrimination" Ex. D), as well as its promise that all other Drexel policies are enforced in a similarly non racist and non sexist way (OED-1, "Equality and non-discrimination policy"), its promise that Drexel is not a sexually hostile campus (OED-3, I "Summary of Policy" stating:  "The University is committed to providing an environment free from discrimination, including discrimination based on sex and gender, and has a zero-tolerance policy concerning any and all forms of sexual harassment and misconduct." Ex. D), its promise on how it defines consent (OED-3, VI. "Definitions and Examples", stating:  "Statement on Consent, Coercion, Incapacitation, and Alcohol: Engaging in sexual activity without consent violates University policy and may result in criminal and/or civil liability. For purposes of this Policy, consent is a freely and affirmatively communicated willingness to participate in sexual activity or behavior, expressed either by words or clear, unambiguous action. Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Consent may

not be inferred from silence, passivity, lack or resistance or lack of active response." Ex.

D) and thus its promise on what constitutes sexual assault at Drexel (OED-3, No. VI, P. 6,

Ex. D), its promise that Drexel affords procedural fairness and respect to respondents or

complainants of sexual assault (OED-3, XI "Review, Investigation and Resolution of

Complaints" stating that "The investigation will be thorough, impartial and fair, and all

individuals will be treated with the appropriate sensitivity and respect", Ex. D), its

promise that:  "Each process is guided by the same principles of fairness and respect for

all parties. Before any disciplinary action is taken, all parties will have notice of the

allegations, the opportunity to respond, and the opportunity to be heard" (Ex. D), and its

promise that respondents of sexual assault, as well as victims of sexual assault receive

support (OED-3, XI, "Review, Investigation and Resolution of Complaints" stating that:

Resources are available for both students and employees, whether as Complainants or

Respondents, to provide guidance and support throughout the investigation and resolution

of the complaint. Ex. D).

     48.    During the reporting, charge, investigation and punishment phases Drexel

breached its OED-3 duties to Mr. Saravanan as a respondent under each of these and

other promises when it discriminated against him based on his gender (Nos. 9 - 30) or

race (Nos. 38 - 45).

     49.    During the reporting, charge, investigation, and punishment phase Drexel

breached its OED-3 duties to Mr. Saravanan as a complainant to provide an educational

environment with zero tolerance of sexual assault (Ex. D, Ex. J), and was deliberately

indifferent to its duty to protect Mr. Saravanan from J.K., which caused plaintiff to live in

a sexually hostile campus (No. 31).

50.     Drexel also breached its OED-3 promises as to how to handle this matter at the charge and the investigation stage because it did not behave in a manner that was thorough (See, e.g., Nos. 23, 24 averring that Drexel did not charge J.K. with all it should have, Ex. A, 2 and Ex. B, 4 proving that the report did not state what the witnesses had testified to Ms. Perez) or impartial (See, e.g., Ex. A, 2 and Ex. B, 3 proving that Ms. Perez' interviews for the report assumed Mr. Saravanan's guilt and never even inquired into J.K.'s conduct) which produced a deeply flawed charge and investigation as a result.

51.     Drexel similarly breached its OED-3 promises on notice and opportunity to respond both at the investigative and the punitive phase denying Mr. Saravanan the opportunity to fully present his defense at the investigative stage (Nos. 14, 16, Ex. C), denying him the opportunity to respond to evidence (No. 9, Ex. C, 2 and fn. 1), and resolving the matter by expelling him using information he was not able to confront before while ignoring the similar evidence he presented against J.K. (No. 18).

52.     In addition Drexel did not provide its promised support to plaintiff as a respondent (OED-3 No. VIII, P. 12 in Ex. D) and provided its deliberate indifference to his reports against J.K. as complainant instead of the similarly promised support. (Nos. 31 – 37).

53.     Drexel breached its promises to Mr. Saravanan that exist both in the contract and in the law Drexel operated under at the time to provide trained staff to handle these matters without regard to gender of race of the complainant or respondent. (Ex. D, Ex., J).  That the staff was not trained, fell prey to its gender and race biases, and conducted a flawed charge, investigation and punishment which favored the woman over the man, is stated through their actions as averred in Nos. 9, 13, 14, 15, 16, and 18.

54.     Drexel breached its promises on Mr. Saravanan's privacy (Ex. D, OED V

statement of privacy) when it published and posted on campus a flyer with many forms of

identifiable information about him like his name, student ID number, and face (Ex. L).

55.     Drexel's breach of these promises, all of which favored J.K, a white

woman over Mr. Saravanan, a male of color, caused irreparable harm to plaintiff

including but not limited to pain, suffering, and loss of reputation and business

opportunities.

## Drexel Deceived Mr. Saravanan into Enrolling and Relying on the Sexual Assault Policy in Violation of the UTPCPL.

56.     Mr. Saravanan chose to attend Drexel from a number of schools that

offered him enrollment like the University of Delaware and the University of Connecticut

because he believed and thus justifiably relied on Drexel's promises of fairness and racial

inclusiveness, and its reputation as an educational environment free from sexual hostility.

It was deceptive, misrepresenting conduct from Drexel to make such promises to Mr.

Saravanan as Drexel breached them.

57.     During the investigative and adjudicative phase of this disciplinary

proceeding, Mr. Saravanan believed and thus justifiably relied on Drexel's specific

promises related to sexual assault and non-racial discrimination, including its definition

of consent (OED-3 VI), its promise of thoroughness in investigations for respondents and

complainants (OED-3, XI), its promise of respect for respondents and complainants (Ex.

D), President Fry's promise that Drexel was at the forefront of sexual assault (Ex. J) and

other provisions in the OED-3 policy stated above concerning no tolerance for racism .  It

was deceptive, misrepresenting conduct for Drexel to make such promises to Mr. Saravanan as Drexel breached them.

58.     Because of Mr. Saravanan's reliance on Drexel's promises which became Drexel's deceptive conduct, instead of going to UD or UConn, Mr. Saravanan ended up a victim of sexual assault on Drexel's campus who in addition suffered the ascertainable loss of not obtaining a Drexel degree, of losing his tuition money for the semester, of losing his grades as well as his reputation and career expectations because Drexel expelled him; an injury that will cause harm for the remainder of Mr. Saravanan's life.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of Title IX--Reverse Discrimination

59.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

60.     The third Circuit allows a plaintiff to plead upon information and belief where information is in defendant's sole control, "so long as [plaintiff] does not rely on boilerplate and conclusory allegations and he accompanies his legal theory with allegations that make his theoretically viable claim plausible." *McDermott*, 649 F. App'x at 268.

61.     Drexel cannot deny that information about its disciplinary precedent, and particularly the statistics as to its treatment of male respondents and female respondents is in its sole control.

62.     In addition this Court should adopt the 2nd Circuit's game-changing decision in Doe v. Columbia which has incorporated the McDonnell Douglas Title VII

burden shifting standard for pleadings of reverse Title IX discrimination claims.

Columbia at 55-56, accord, John Doe v. Regents of the University of California, (2:15-cv-02478 Order Denying Motion to Dismiss, June 8, 2017) which adopted this standard.

63.    Plaintiff's averments cast doubt on the outcome and handling of this investigation and discipline.  They also make it plausible that the proceeding's handling was erroneous due to Drexel's bias against the plaintiff.

64.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et seq. ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

65.    Drexel cannot deny it receives extensive federal funding.

Title IX is enforceable through an implied private right of action affording an individual discriminated against due to his gender damages and equitable relief.

Courts recognize violations on reverse Title IX claims under several theories including erroneous outcome and selective enforcement. Plaintiff makes a claim of discrimination under those theories.

66.    At the time of the events relevant to this complaint both the Department of Education and the Department of Justice had promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student...complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 CFR Sec. 106.8(b) (Dep't of Ed); 28 CFR Sec. 54.135(b) (DOJ).  These actions include any form of sexual touching.  See generally,

U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties--Title IX (2001) at 19-20, 21 & nn. 98-101.  (Guidance)

67.     The procedures adopted by Title IX covered school like Drexel, must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."  (Guidance, id at 22).

68.     These procedures that in the view of the Guidance accord due process when well instituted and aptly followed, must include, at a minimum: "<u>Adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence</u>".  (Guidance, id at 20).  [Emphasis added].
A school also has a Title XI mandated obligation to make sure that all persons handling these procedures "have adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults'".  (Guidance, id at 21).

69.     Based on the foregoing averments of fact, defendant Drexel has deprived Plaintiff on the basis of his sex of his Title IX rights, of his statutory due process rights, and to equal protection through the improper, malicious, sex-based application of its policies for handling sexual assault which led to the erroneous outcome, selective enforcement and in the case of plaintiff's rape experience deliberate indifference in this matter.

70.     Drexel's policies and procedures have deprived Plaintiff, on the basis of his sex, of the right to a thorough charge, investigation and resolution.

71.     Due to Plaintiff's gender, Drexel imposed sanctions on Plaintiff that were excessively severe and to the benefit of J.K. because of her sex in violation of Title IX.

72.     As a direct and proximate consequence of Drexel's Title IX violations, Plaintiff has sustained significant damages including expulsion from Drexel.

73.     Plaintiff has also suffered monetary damages, profound emotional distress, loss of educational opportunities, and other direct and consequential damages including pain and suffering as well as legal fees.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the following relief:

(a)     Mandate that Drexel correct Plaintiff's academic and/or disciplinary record to remove any findings issued by the University with respect to all the charges levied against him by Drexel and/or J.K. which led to his suspension and to his expulsion, even if later styled as a "voluntary withdrawal";

(b)     Mandate that Drexel verify this correction by providing Plaintiff with a notarized letter confirming that any findings with respect to these charges have been expunged from Plaintiff's academic and/or disciplinary record;

(c)     Mandate that Drexel immediately allow Plaintiff to re-enroll in the University to complete his education with credit for the few courses Plaintiff has taken to date;

(d)     Process J.K. for her assault of Plaintiff on August 18, 2015 and for presenting a false claim on it 363 days later;

(e)     Award Plaintiff compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to attorneys' fees, expenses and costs; and

(f)      Award Plaintiff any other and further relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION

## Violation of Title IX--Deliberate Indifference to Plaintiff's Sexual Assault and Sexual Hostility Reports.

74.      Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

75.      From the start, Drexel was on notice of, and was deliberately indifferent to plaintiff's initial reports and to plaintiff's sworn in Court testimony that J.K. sexually assaulted him (Ex. K, 59, 21-25, 60, 1-4) and later Drexel knew of J.K.'s admission that she had "misbehaved" and that Plaintiff said "no" (Ex. E).

76.      The serious flaws in Drexel's investigation, the lack of equity and fairness, and the gender bias in favor of females infused the process.

77.      As a result Drexel's officials in charge of protecting plaintiff, once fully aware of plaintiff's claim that J.K. raped him and created a sexually hostile academic environment for him chose to not protect him, and instead favored her.

78.      Drexel's lax, biased, and bad faith application of the Disciplinary Procedures against J.K. was motivated by and premised on this deliberate indifference to plaintiff's reports against J.K.

79.      The fact that Drexel's own review of Mr. Rupprecht's and Ms. Rovinsky's punishment states that they did not sanction J.K. at all is evidence that Drexel discriminated against Plaintiff with deliberate indifference to his rape experience and report because in addition they harshly sanctioned him.

80.     Drexel's conduct was so severe, pervasive, and objectively offensive that it denied the Plaintiff equal access to education that Title IX is designed to protect.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the following relief:

(a)     Mandate that Drexel correct Plaintiff's academic and/or disciplinary record to remove any findings issued by the University with respect to all the charges levied by J.K. against him;

(b)     Mandate that Drexel put a finding of sexual assault on J.K.'s record;

(c)     Mandate that Drexel verify these corrections by providing Plaintiff with a notarized letter confirming that any findings with respect to these charges have been expunged from Plaintiff's record and have been marked on J.K.'s record;

(d)     Mandate that Drexel immediately allow Plaintiff to re-enroll in the University to complete his education with credit for the few courses Plaintiff has taken to date;

(e)     Award Plaintiff compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to attorneys' fees, expenses and costs; and

(f)     Award Plaintiff any other and further relief that the Court deems just and proper.

### THIRD CAUSE OF ACTION

### Violation of Title VI

81.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

82. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq et seq. ("Title VI"), provides in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

83. Based on the foregoing averments of fact, defendant Drexel has deprived Plaintiff on the basis of his race (South Asian) and national origin (Indian) of his rights to due process and to equal protection through the improper, malicious, racist, or deliberately indifferent application of its policies for handling complaints of sexual assault against and by him at an institution of higher learning that receives federal funds.

84. Drexel has discriminated against Plaintiff, on the basis of his race and national origin, through discriminatory, race-based implementation of Drexel's policies and procedures that comparators, white males and non-Indians also accused of assault, and in the case of those who should have been charged with assault, like J.K., did not experience.

85. Drexel has violated Plaintiff's rights to be free from race based discrimination under Title VI of the Civil Rights Act of 1964 including, as provided under 20 CFR Sec. 42.101 et seq., at 42.104.(b):

      (i) Denying Plaintiff services and access to financial aid given to other students.

      (ii)  Giving Plaintiff different services than those given to the other students.

      (iii) Segregating and treating Plaintiff separately from the other students.

(iv) Treating Plaintiff differently from other students, including those

white males and non-Indians facing or who should have been charged with

violations of Drexel's sexual assault policies in terms of his enrollment.

(v) Denying Plaintiff's ability to participate in Drexel programs including

ancillary academic activities like the sports facilities and social spaces.

86.     Drexel initiated and conducted the charge, investigation, and subsequent

hearing of J.K.'s complaint and of plaintiff's complaints in a manner that was biased

against Plaintiff due to his race and national origin and which is different from the

investigation and treatment by Drexel of white male sexual assault respondents and white

female respondents (specifically J.K.).

87.     Plaintiff avers inaccuracies that cast doubt on the initial charge of

misconduct, in the investigation of that charge, and in the assignment of discipline

stemming from that charge which suggest a racial bias against plaintiff.

88.     All of these race motivated actions violate Drexel's contract with Plaintiff,

federal and state guidelines on race and education, and demonstrate defendant's race-

motivated discriminatory bias against Plaintiff, in violation of Title VI.

To post a flyer throughout Drexel's campus with plaintiff's face, FERPA-protected.

89.     The racial and national discrimination which Plaintiff seeks to redress

constituted exclusion from participation in federally funded matters; practices which are

made unlawful by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000d.

90.     As a direct and proximate result of Defendant Drexel's unlawful

exclusionary practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has

been deprived of economic and non-economic benefits including, but not limited to inability to study and to finish his studies, wage loss, failure to grow academically and professionally, pain and suffering, mental anguish, humiliation, loss of fringe benefits, painful embarrassment among his friends and peers, disruption of his personal life and loss of enjoyment of life.

91.     The above-mentioned acts were willful, wanton, malicious and oppressive and done with reckless disregard for Plaintiff's federally protected rights to not be discriminated against because of his race, therefore justifying the imposition of punitive damages.

**WHEREFORE,** As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial in excess of $150,000.00, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.  Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action as well as to enter any equitable relief that this court may deem proper.

<u>**FOURTH CAUSE OF ACTION**</u>

<u>**Violation of Section 1981 of the Civil Rights Act**</u>

92.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

93.     Plaintiff is a male of color and a US Citizen of South Asian race and Indian national origin who had a contract with Drexel University to obtain education, to be protected from sexual harassment both as complainant and respondent, and to receive housing.

93.    42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In Runyon v. McCrary, 427 U.S. 160 (1976), the Supreme Court held that Section 1981 regulated private conduct as well as governmental action.

94.    In violation of its own contract and policy, Drexel investigated, evaluated and suspended Plaintiff based on an inherently false complaint from J.K., herself a white complainant, while completely ignoring Plaintiff's complaint of significantly worse acts that J.K. victimized him with. In that process Drexel suppressed evidence and applied different standards for Plaintiff and to J.K. because of intentional animosity towards his race including assuming his guilt.

95.    Drexel, on information and belief, treats non-Indian respondents to disciplinary processes like this one better than it treated plaintiff who is entitled, under Third Circuit law, to plead this claim at the complaint stage in the alternative, citing to comparators on information and belief.

96.    In all these investigations and determinations Drexel treated Plaintiff in a discriminatory manner that violated their contract under a racial motivation.

97.    Plaintiff's race and national origin were motivating factors in Drexel's handling of the sexual assault complaint from a white female, which led to Plaintiff's suspension and expulsion all the while ignoring and undermining plaintiff's complaints against J.K.

**WHEREFORE,** As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial in excess of $150,000, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements as well as to punitive damages.  Plaintiff requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action and requests any other equitable relief that this court may deem proper to ensure that Plaintiff is not discriminated against on the basis of his race and or their national origin

## FIFTH CAUSE OF ACTION

### Breach of Contract

98.     Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

99.     At all times relevant hereto, a contractual relationship existed between Drexel and Plaintiff through, inter alia, Drexel's Student Handbook, Drexel's Policies and Procedures including its sexual assault and investigation policy OED-III and Drexel President Fry's letter in Exhibit J.

100.    Drexel was required to act in accordance with that contract.

101.    For all the reasons set forth above, Drexel has materially breached its contracts with Plaintiff by failing to comply with policies and procedures governing sexual misconduct and racial discrimination.

102.    As a direct, proximate and foreseeable consequence of Drexel's numerous material breaches, Plaintiff has sustained significant damages including, but not limited to, having an academic and/or disciplinary record(s) indicating that he was found to have committed sexual misconduct.

103.    Plaintiff was also suspended and then expelled from Drexel as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, defamation, pain and suffering, and other direct and consequential damages.

104.    Plaintiff was also sexually assaulted and victimized at and by Drexel as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, defamation, pain and suffering, and other direct and consequential damages.

105.    Plaintiff is entitled to recover damages for Drexel's breach of its contractual obligations and duties including specific performance of the contract.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action and any further relief this court may deem just and proper including specific performance and any other equitable relief.

## SIXTH CAUSE OF ACTION

### Unfair and Deceptive Trade Practices

106.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

107.    The Pennsylvania Uniform Trade Practices and Consumer Protection Law, 73 P.S. §201-1 et seq, creates a private right of action for consumers of Pennsylvania-based services, such as Plaintiff's consumption of Drexel's educational services, whose characteristics have been misrepresented, including "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."

108.    Defendant Drexel has engaged in acts and practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances because they create the likelihood of confusion and misunderstanding:

a.    by causing Plaintiff to believe that Drexel would follow its policies both as they were provided to Plaintiff and as they were stated in the Policies and Procedures and elsewhere throughout the Drexel web page and printed materials.

b.    by causing Plaintiff to believe that if he accepted Drexel's offer of enrollment and paid the related tuition, Drexel would uphold its obligations, covenants and warranties to Plaintiff as described in its policies.

109.    Defendant had no intention of following and in fact did not follow its own policies and procedures nor did it uphold its obligations for Plaintiff's disciplinary actions.

110.    It is particularly deceptive, as a practice, for Drexel to have taken J.K.'s allegations at face value, for Drexel to have ignored the blatant fact that J.K. sexually assaulted plaintiff, for Drexel to have added factors to punish plaintiff after the adjudication but ignored these corresponding factors when stated by plaintiff against J.K., for Drexel to have put the burden on Plaintiff to prove that he did not stalk J.K. and for Drexel to state it has a trained and fair Title IX team and policy when it clearly does have a policy but it does not have a properly trained, unbiased team enforcing it.

111.    President Fry's letter that Drexel should be at the forefront of Title IX enforcement is deceptive in this context.  (Exhibit J).

112.    In addition it is deceptive, as a practice, for Drexel to prosecute the accusation against Plaintiff while having been deliberately indifferent to Plaintiff's symmetrical accusation against J.K. which should have been equally investigated but was not.

113.    Based on the foregoing defendant Drexel engaged in deceptive or unfair trade practices in violation of the UTPCPL, 73 P.S. §201-1 et seq.

114.    As a direct, proximate and readily foreseeable consequence of Drexel's aforementioned conduct in violation of the UTPCPL, Plaintiff has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation of sexual misconduct.

115.    Plaintiff has also suffered monetary damages, emotional distress, pain and suffering, loss of education opportunities, and other direct and consequential damages.

**WHEREFORE**, Plaintiff, respectfully requests that this Honorable Court enter judgment in his favor against Drexel and provide the relief requested in the first cause of action, treble damages as allowed under the UTPCPL, attorney's fees as allowed under the UTPCPL and any further relief this court may deem just and proper including a finding that Drexel induced Plaintiff to rely on its promises to achieve his enrollment and any other equitable relief.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor against Drexel in compensation in an amount in excess of $150,000.00 in

addition to pre-judgment interest, attorneys' fees, expenses, costs, disbursements, and any

other further relief the Court deems just and proper including equitable relief.

Respectfully submitted,

Dated:  October 23, 2017

/s/ Raul Jauregui

_____

Raul Jauregui, Esq.
Jauregui Law Office
720 Arch Street
PO Box 861
Philadelphia, PA 19107
(215) 559-9285
(610) 543-1501 fax
Raul.Jauregui@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Amended Complaint was served on this 24th day of October, 2017, by email and via this Court's ECF upon:

> Michael E. Baughman, Esquire
> Hedya Aryani, Esquire
> PEPPER HAMILTON LLP
> 3000 Two Logan Square
> Eighteenth and Arch Streets
> Philadelphia, PA  19103-2799
> *Attorneys for Defendant*

> By:    /s/ Raul Jauregui
> Raul Jauregui, Esquire
> Jauregui Law Office
> 720 Arch Street
> PO Box 861
> Philadelphia, PA 19107
> (215) 559-9285
> Raul.Jauregui@gmail.com
>
> *Attorney for Plaintiff*